UNITED STATES of America

v.

Andrew Stewart BAUMWALD, et al.

UNITED STATES of America

v.

Norman J. PANITZ, et al.

UNITED STATES of America

v.

Joseph John FRISONE, et al.

UNITED STATES of America

v.

Robert Alan BERZON, et al.

Crim. Nos. 89–00002–P to 89–00005–P.

United States District Court,
D. Maine.

July 27, 1989.

Nicholas M. Gess and William H. Browder, Asst. U.S. Attys., Portland, Me., for U.S.

Martin D. Boudreau, Boston, Mass., for Baumwald.

Richard S. Emerson, Jr., Portland, Me., for Rosen.

Stephanie Anderson, Portland, Me., for DiNolfo.

Robert I. Kalina, New York City, for N. Panitz.

Howard J. Herman, Brooklyn, N.Y., for S. Panitz.

Frank T. Geoly, Brooklyn, N.Y., for Frisone.

Marshall A. Stern, Bangor, Me., Judith H. Mizner, Newburyport, Mass., for Hertz.

Bruce B. Hochman, Portland, Me., for Lopopolo.

Jack Zalkind, Boston, Mass., for Berzon.

Robert D. Hertzberg, Miami, Fla., for Novak.

Barry P. Wilson, Boston, Mass., for Haskins.

Richard M. Egbert, Boston, Mass., for Braun.

MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS' MOTIONS TO SUPPRESS STATEMENTS AND EVIDENCE

GENE CARTER, District Judge.

In these actions Defendants are charged with conspiracy to possess with intent to distribute marijuana and possession with intent to distribute marijuana, in violation of 21 U.S.C. §§ 841, 846 and 18 U.S.C. § 2. The charges are the result of an investigation by the United States Drug Enforcement Agency and other law enforcement agencies. Defendants Rosen, DiNolfo, Solomon Panitz, Norman Panitz, Hertz, Has-

kins, Braun, Novak, and Berzon[1] have moved to suppress statements made by them, evidence taken from them, or both.

## Facts

In the fall of 1988, Michael Goldin, an unindicted coconspirator, planned the importation of 10,000 pounds of marijuana into Maine. Two cooperating individuals ["CIs"], SGI–86–0010 and SGI–86–0011, arranged for the transfer of the marijuana for Goldin, originally from Colombia, by boat through the French West Indies to Maine. On November 20, 1988, Goldin and the two CIs came to South Portland, Maine via Boston. Goldin went to the Sheraton Motor Inn next to an exit on the Maine Turnpike, where he was to stay.

Later that day, Goldin met undercover DEA Agent Bansmer, and they went together to the Damariscotta area in Maine to inspect the marijuana. Goldin selected marijuana samples, most of which were later found in a room at the Sheraton. Goldin agreed to pay the CIs and the undercover agents $660,000 for the transportation, storage and processing of the marijuana.

Goldin was in frequent communication with various individuals concerning the deal. On the twenty-first, Goldin told the CIs that Joe, later identified as Defendant Frisone, was *en route*, bringing money with him, and that Goldin hoped to sell him a large quantity of marijuana. Goldin also told the CIs that Andy was *en route* to Maine with a car and a truck driven by a fifty-five-year-old woman. Andy was later identified as Defendant Andrew Baumwald. Goldin also reported that Defendant Berzon and "Toy," later identified as Defendant Novak, were coming to Portland in connection with the marijuana deal.

After a meeting at the Sheraton later in the afternoon, Goldin told the CIs that Andy had arrived and was staying in a particular room at the Sheraton. Goldin said Andy had brought a Ford and a BMW with him as well as two drivers, a male and a fifty-five-year-old woman. The woman was later identified as Defendant DiNolfo, and the man as Defendant Rosen. Goldin said that he had received the keys for both cars and $15,000 from Andy and that Andy would have $250,000 in cash for more marijuana after the first was distributed. CI 0011 told Goldin that they could not load the cars until Tuesday, November 22, and declined to keep the keys or the money. The officers learned that both Joe and Berzon had arrived.

Over the next two days a pattern of controlled delivery and surveillance was followed, resulting in the arrest of numerous Defendants. Goldin would give the keys of a particular vehicle to undercover Special Agent Gagner or another member of the undercover transport group, and Gagner, sometimes with the assistance of Agent Bansmer, would drive it to the Scarborough Police Barracks, where the marijuana was being stored. Goldin had told Gagner to fill the trunks or cargo areas of the vehicles with marijuana and that was accomplished. Gagner then drove each vehicle back to the vicinity of the Sheraton parking lot where he left it with the keys hidden in it, and numerous law enforcement officers began surveillance. Many of the surveillances are documented by videotapes as well as by reports of the officers. After varying waits, a Defendant or group of Defendants would retrieve the vehicle and head south on the Maine Turnpike.[2] Surveillance of the vehicle was maintained.

---

1. The hearing on Defendant Berzon's motion to suppress statements was postponed because of his counsel's inability to appear at the hearing.

2. There were a few variations on this theme. Some of the drivers stopped for gasoline before driving south. Defendant Solomon Panitz, who left the hotel at approximately 2:00 a.m. in a Chevrolet Caprice, did various maneuvers apparently designed to determine if he were being surveilled and to elude any followers. Surveillance of Panitz's car was briefly interrupted

when he entered the Maine Turnpike by means of a wrong-way ramp. It was reestablished a short time later by officers waiting on the Maine Turnpike.

Also, a pair of vehicles, the black Cadillac driven by Defendant Novak and the Jeep driven by Defendant Braun with Defendant Berzon as a passenger, proceeded in tandem down the highway. The Jeep was not loaded with marijuana. It had carried Defendant Haskins to the

Teams of law enforcement officers had been informed of the details of the investigation and of the information known to date. They were later advised of the description of the vehicles that had been loaded with marijuana. The officers had been instructed by Special Agent Cunniff, the DEA officer in charge, to make a *Terry* stop of each vehicle and to determine whether, based on the investigation information and the circumstances known to them at the time of their stop, they should arrest the occupants of the vehicles.

The stops for the most part were made around Exit 2 on the Maine Turnpike in Wells, Maine. After a routine traffic stop[3] was conducted by a state police officer and questions concerning point of departure and destination were asked, Defendants were informed by another agent that the stop was part of a routine drug interdiction program carried out by the DEA and state law enforcement officers. The purpose, in fact, was to identify individuals involved with the cars carrying the marijuana and to arrest them, if appropriate. In the course of a series of questions about drugs, the drivers were asked if the officers could look in the trunk or cargo areas of the stopped vehicles. Consent was given only by Defendant Haskins. Most of the Defendants denied knowledge of any marijuana, and indeed none had looked into the trunk or cargo area of his or her vehicle before leaving the Sheraton parking lot.

Despite the lack of consent in most cases, the officers looked into the trunk or cargo area of each vehicle and, having seen the marijuana, placed Defendants under arrest. *Miranda* warnings were administered to each Defendant and they were transported back to lock-ups in Portland. The vehicles were removed by teams of officers who had been waiting to assist if arrests should be made.

The Court notes that passengers in the cars transporting marijuana were arrested as well as the drivers. Also arrested were Defendants Braun and Berzon, the occupants of the Jeep which had dropped two of the drivers off at two of the waiting marijuana-filled vehicles and which had then traveled in tandem with one of those vehicles on the Maine Turnpike.

In this manner, on November 22, 1988, Defendant DiNolfo was arrested with the Ford LTD, Defendants Baumwald and Rosen were arrested with the BMW, Defendant Haskins was arrested with a pickup truck, Defendant Novak was arrested with a Cadillac, and Defendants Berzon and Braun were arrested with the Jeep. Early on the morning of November 23, Defendant Solomon Panitz was arrested in the Chevrolet Caprice, and later that morning Defendants Frisone, Hertz, and Lopopolo[4] were arrested in a gold Mercedes.[5] All of the vehicles except the Jeep contained large quantities of marijuana that had been placed in them by the investigating officers on instructions by Goldin. Tr. 46.

Some of the Defendants made statements at the time of their arrests or while being transported to Portland. The circumstances of these statements will be discussed more fully later. After the arrests of all of the individuals in the car had been accomplished, on the afternoon of November 23, 1988, Special Agent Cunniff went to Room 518 of the Sheraton Motor Inn, identified himself, and arrested Jaime Suarez. The other occupant of the room identified himself as Norman Panitz. After asking Panitz a few questions, Agent Cunniff also arrested him. Some of the sample marijua-

---

truck in which he was later arrested and had brought Defendant Novak to the Cadillac.

3. Variations in this procedure are discussed with regard to individual Defendants in the section on suppression of statements.

4. The government has dismissed the charges brought against Ms. Lopopolo.

5. Before these arrests were made but after the Panitz car had been loaded and the Mercedes

had been consigned to the undercover agents, Goldin, after being confronted by DEA agents, decided to cooperate with the government. He told the officers that Frisone had traveled to Portland with Defendants Hertz and Lopopolo, bringing $50,000 with him. Although Frisone reportedly was not happy with the quality of the marijuana, he agreed to take some back to New York.

na given to Goldin was found in the closet of the room.

## Discussion

■ The first issue raised by Defendants' motions is whether the arresting officers could stop and search the vehicles as they did without warrants. The agents had been told by Goldin that he was having various people come to Maine to buy the marijuana and take it back to New York. Goldin had mentioned some of the people he expected by first name, description, or nickname, but he had not provided their names so the agents did not know exactly who was involved in the conspiracy. A plan was set up whereby Goldin gave the keys for a number of different automobiles to Special Agent Gagner or other undercover personnel so that Gagner and others would load them with the marijuana that had been brought from Colombia. Given the information from Goldin and the nature of the plan—that Gagner would return the cars to the Sheraton parking lot and leave them there in a specific area with the keys in them for pick-up—the officers had probable cause to believe that individuals who came, got into the cars, and headed south with them on the turnpike were involved in criminal activity. The officers, therefore, had probable cause to stop the cars and arrest the occupants, particularly after the initial questioning determined where they were from and where they were going.

Once there was probable cause to arrest the occupants of the marijuana-bearing vehicles under *New York v. Belton*, 453 U.S. 454, 460, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981), the officers permissibly could search, incident to arrest, the passenger compartments of the vehicles.[6]

In the more recent case of *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), the Supreme Court referred to the automobile exception to the warrant requirement and "consider[ed] the extent to which police officers—who have legitimately stopped an automobile and who have probable cause to believe contraband is concealed somewhere within it—may conduct a probing search of compartments and containers within the vehicle whose contents are not in plain view." The Court held that "they may conduct a search of the vehicle that is as thorough as a magistrate could authorize in a warrant 'particularly describing the places to be searched.'" *Id.* at 800, 809, 102 S.Ct. at 2160, 2164.

The officers here obviously had probable cause to search the vehicles. They *knew* that there was marijuana in the trunks or cargo areas because they had put it there. Certainly a magistrate, aware of such knowledge, could have issued a warrant for searches of the trunks of the automobiles in question.

Defendants suggest that the automobile exception to the warrant requirement initially set forth in *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), does not pertain here because the automobile exception is based on exigent circumstances which were not present in this case. The Court is persuaded, however, that in *Ross*, 456 U.S. at 807–08, 102 S.Ct. at 2163–64, and the more recent case of *California v. Carney*, 471 U.S. 386, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985), the Supreme Court has made clear that probable cause alone suffices to justify the warrantless search of a vehicle. *See United States v. Bagley*, 772 F.2d 482, 491 (9th Cir.1985); *United States v. $29,000—U.S. Currency*, 745 F.2d 853, 855 (4th Cir.1984).

■ In any event, this is not a case in which the agents were required to obtain a warrant before stopping the subject vehicles on the Maine Turnpike.[7] As the

6. The government incorrectly argues that *Belton* makes permissible searches of entire vehicles incident to arrest. The *Belton* majority plainly stated: "Accordingly, we hold that when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." *Belton*, 453 U.S. at 460, 101 S.Ct. at 2864.

7. The Court notes that most of the cases cited by Defendants to the effect that a showing of exigent circumstances is required for warrantless searches and seizures are not cases involving

court said in *United States v. Cresta,* 825 F.2d 538, 553 (1st Cir.1987), "[h]ere exigent factors did arise and it does not matter when they did." The fact that the agents might have obtained a warrant earlier does not negate the possibility of a current situation requiring their prompt action. *Cardwell v. Lewis,* 417 U.S. 583, 596, 94 S.Ct. 2464, 2472, 41 L.Ed.2d 325 (1974). Once the individuals picking up the loaded cars arrived, there was no time to get a warrant because the drivers might escape with the marijuana in the cars.

This is not a case in which the government agents deliberately created exigent circumstances *in order to create an exception to the warrant requirement. See Cresta,* 825 F.2d at 553. Although the agents presumably had probable cause to get warrants as soon as the cars were loaded, there were "countervailing factors" justifying the failure to do so even though the nature of the searches and seizures were fully anticipated. *See Niro v. United States,* 388 F.2d 535, 539 (1st Cir.1968).

The objective of the DEA controlled delivery operation on November 21–23, 1988 was not to search the vehicles for marijuana but to identify persons involved in the drug distribution conspiracy with Goldin by stopping cars provided to them by Goldin and loaded by them with marijuana at Goldin's behest. Goldin, who was not cooperating with the government until early on the morning of November 23, 1988, controlled the details of the distribution of the marijuana. He arranged for the purchasers to come to the Sheraton, he collected the keys, he told the officers which vehicles to fill, where to pick them up and where to

deliver them. For the officers' investigation to be successful, they had to follow Goldin's plan. As Special Agent Cunniff testified, execution of a warrant could well have frustrated the investigative goal of identifying coconspirators if it were done in view of other participants who were then unknown to the agents or if Goldin or other participants were to find out and become suspicious. Tr. 147.[8] Moreover, the delay sometimes encountered in obtaining a warrant might have generated suspicion in the persons awaiting delivery of their vehicles and prompted their flight. Tr. 148. The Court finds that need to prevent frustration of the whole plan was, in this case, a countervailing factor, *see Niro,* 388 F.2d at 539 (1st Cir.1968), or an exigent circumstance, justifying failure to seek a warrant. *See United States v. Rengifo,* 858 F.2d 800, 804–05 (1st Cir.1988) (exigent circumstances exist when a reasonable officer could believe that to delay acting to obtain a warrant would, in all likelihood, permanently frustrate an important police objective).[9]

The Court finds, therefore, that the stops and searches of the vehicles that had been loaded with marijuana by the DEA did not violate the Fourth Amendment.[10]

### Arrests

Defendant Hertz also challenges his arrest as not being based on probable cause. He asserts correctly that there was no evidence that he was mentioned by Goldin or anyone else as a purchaser or possessor of marijuana, that he had had any conversations with Goldin or other undercover agents or informants, or that he

the search of vehicles but rather the search of dwellings.

8. The Court also notes that the fact that both the scope of the conspiracy and the identity of the participants were unknown presented a potential safety problem for the officers if they were to obtain and execute warrants for individual vehicles presented.

9. The Court notes that although Goldin had begun to cooperate before the loaded Frisone vehicle was delivered, and the government therefore was in total control of the operation, the same factors militating against the seeking of a

warrant were present. The government did not know at that time that the Frisone car was the last that would arrive. Tr. 148. Moreover, a change in the plan previously described to them by Goldin or a delay caused by the seeking of a warrant might have caused Defendants to flee without accepting delivery of the loaded car.

10. In his Reply Memorandum, Defendant Haskins argues that the consent he gave to search his truck was not voluntary because of the allegedly coercive setting at the time of his arrest. *See infra* at 234. As has been demonstrated in the text, the search of Haskins' truck was permissible whether he gave his consent or not.

knew what was in the trunk of the car. He argues, therefore, that he was arrested simply on the basis of his presence and his association with Defendant Frisone. The Court cannot agree. Defendant Hertz was *driving* an automobile loaded with marijuana at the time of his arrest. He had come from New York to Maine with Joe [Defendant Frisone], who had been mentioned as a possible purchaser and who was a passenger in the car. Goldin had mentioned that Hertz had traveled to Maine with Frisone. Tr. 131. Hertz had picked up the car at a specified location after it had been loaded with marijuana. These affirmative steps of coming to Maine with someone identified as a purchaser of marijuana, picking up the car at a specified location, and driving it south are enough for the officers to infer that he was more than merely present at a place where marijuana was found. While lack of knowledge may be an issue to be raised at trial, the Court finds that on the record before it, the officers had probable cause to believe that Defendant Hertz was involved in a conspiracy to possess marijuana with intent to distribute it.

Defendant Norman Panitz has also challenged his arrest on the grounds that Agent Cunniff lacked probable cause. It is plain to the Court, however, that probable cause to arrest Panitz existed. Cunniff went to Room 518 of the Sheraton, which was Goldin's room. Goldin was the moving force in the marijuana distribution scheme. The night before, when he had become a cooperating witness, Goldin had told Cunniff that he had called Norman and asked him to come to Portland to collect money owed him and to bring his brother "Bif" so that Goldin could give Bif some marijuana. Goldin had also told Cunniff that Norman and Bif were in Portland as a result of that conversation. Cunniff knew when he went to Room 518 that a Solomon Panitz had been arrested with a trunk load of marijuana the previous evening.

In response to Cunniff's questions, Defendant Panitz gave his name and said he had a brother Bif. In response to the next few questions, Panitz stated that he did not have a brother Bif and that he was not staying at the Sheraton.

The fact that Norman Panitz was probably associated in some way with Goldin (he was in his room) and had a brother named Bif made it likely that Panitz was the "Norman" to whom Goldin had referred. The facts that Bif and Norman were in Portland together and that another person named Panitz had been arrested while transporting marijuana made it inferable that Norman had indeed brought his brother to Portland to be given marijuana. Cunniff, therefore, had probable cause to believe that Defendant Panitz was part of the conspiracy.

Defendant Panitz seeks to suppress a key to a room at the Sheraton found during a search of his person after his arrest. He also seeks to suppress the marijuana sample found in Special Agent Gagner's gym bag in the closet of room 518. The Court will not suppress the key since it was made during a search incident to Panitz's custodial arrest. *United States v. Robinson,* 414 U.S. 218, 235, 94 S.Ct. 467, 476, 38 L.Ed.2d 427 (1973).

■ To the extent that Defendant Panitz also seeks to suppress the gym bag with the marijuana sample found in the hotel room's closet after Panitz's arrest, the Court finds that he lacks standing. Goldin and Suarez had been staying in room 518, and it was registered to one or the other of them. No evidence shows that Panitz was anything other than a passing visitor there. He denied he was staying in the Sheraton, and the key to a different Sheraton room was found in his pocket. His mere presence in the hotel room does not give him standing to object to the search of it. *United States v. Irizarry,* 673 F.2d 554, 556 (1st Cir.1982). Moreover, the gym bag found belonged to Agent Gagner and had been given by him to Goldin, not to Panitz.

## *Statements* [11]
### *Defendant Rosen*

Defendant Rosen was stopped on the Maine Turnpike while driving a BMW, the

---

11. Defendant DiNolfo has withdrawn her motion to suppress statements.

trunk of which was loaded with marijuana. Trooper Curran, Agent Bryfonski, and another uniformed trooper were in the police car which haled him to roadside. Trooper Curran asked routine traffic-stop type questions, he requested Rosen's license and registration, and asked where he had come from. He then asked Rosen to go to the back of the car where Agent Bryfonski told him that they were conducting a routine drug interdiction program and asked him several questions. Rosen said he had been visiting in Portland, but that he could not recall the people with whom he had visited. Also in response to a question, he said there was nothing in the trunk. Bryfonski looked in the trunk and placed Rosen and passenger Baumwald under arrest. Bryfonski administered *Miranda* warnings to Rosen, and Rosen indicated that he understood them. He also indicated he was willing to answer questions. Tr. 386. Rosen then answered Bryfonski's questions about where he had obtained the marijuana and whether he was under direction to make any telephone calls to anyone at that time.

After the arrest, two or three other officers arrived. Defendant Rosen was transported to Portland by Officer Peter DeRice. During the trip, Rosen volunteered some information about having come from New York and staying at the Sheraton, asked DeRice various questions about where they were going, whether he could make a phone call and whether DeRice could recommend an attorney. DeRice responded to the questions. At one point, Rosen mumbled, and DeRice said "excuse me." Rosen then said, "I didn't think that they would make such a big deal out of a little bit of grass, 100, 130 pounds." DeRice reminded Rosen of his rights.

Defendant Rosen argues that the statements made to Agent Bryfonski after he administered the *Miranda* warnings should be suppressed [12] because Defendant, having acknowledged that he understood the warnings, did not waive his rights. The record is directly to the contrary. In response to Rosen's counsel's question whether Rosen had acknowledged questions rather than offering information, Bryfonski replied:

> He acknowledged to me that he understood the rights that I read to him. He appeared to me to be in a situation, in capacity to be able to understand those rights, and I asked him if he was going to answer any questions. His acknowledgment to me was that he was willing to answer questions. I asked him questions about the *Miranda* to which he responded.

Tr. 386. The Court finds, therefore, that Defendant Rosen waived his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and provided the answers to Agent Bryfonski. Since the answers were not obtained in violation of Defendant's rights, they will not be suppressed.

█ Defendant Rosen also strenuously challenges the government's ability to use the statements he made to Officer DeRice during the trip to Portland. In its *prehearing* memorandum, the government had stated that it would not "offer in evidence any statements made by the defendant after his removal from the scene of his arrest." Defendant argues that he has been seriously prejudiced in his ability to support his motion to suppress because the government's change in position came after the suppression hearing.

The record belies this contention. When the government called Agent Bryfonski, it made clear that his testimony and that of Officer DeRice who was to follow would relate to statements made by Defendant Rosen. Tr. 356. Defense counsel offered no objection at that point and proceeded to cross-examine Bryfonski. When the government called Officer DeRice, counsel said: "With the exception of Mr. Emerson and Defendant Rosen the government has no further evidence. I have one last witness, Agent DeRice, who received a state-

---

12. In his brief, Defendant Rosen does not appear to challenge the admission of statements made before he was formally placed under arrest. The Court notes that the situation until the point of the formal arrest was noncustodial, so no *Miranda* warnings were required. *See United States v. Quinn,* 815 F.2d 153 (1st Cir. 1987).

**234**

ment as Mr. Rosen is driven to Portland." Tr. 429. Defense counsel offered no objection at this point either and conducted a thorough cross-examination of Officer DeRice.

The testimony of Officer DeRice shows that Rosen was not subjected to interrogation by Officer DeRice and that he volunteered the statements made to that officer, having been informed of and having understood his rights under *Miranda.* The Court, therefore, finds no grounds to suppress Defendant Rosen's statements.

### Defendant Haskins

█ Later on November 22, 1988, Trooper Curran and Agent Bryfonski stopped Defendant Haskins in a pickup truck loaded with marijuana. The stop procedure was basically the same as that used for Rosen except that it occurred after dark and there were a number of other agents nearby with guns drawn because they had heard that Haskins might be armed. Agent Bryfonski told Haskins of the spurious routine drug interdiction program and asked if he could inspect the truck. Haskins said that he could. Having seen the marijuana and placed Haskins under arrest, Bryfonski administered the *Miranda* warnings to him and asked him if he were willing to cooperate. Haskins responded by saying, "You were waiting for me all along, weren't you." Haskins had appeared to Bryfonski to understand his rights and when Bryfonski asked him if he wanted to provide any further information, he refused, saying he wanted to talk to an attorney.

Defendant Haskins argues that the statement made to Agent Bryfonski was not voluntary because the circumstances were inherently coercive. The government concedes, and the Court agrees, that Defendant Haskins was in custody from the time he was stopped and surrounded by armed police officers. He was, however, plainly informed of his rights under *Miranda.* He volunteered the statement that he made in

response to the *Miranda* warnings. The officers did not promise him anything, intimidate him, or trick him into breaking his silence. *See United States v. Pinto,* 671 F.Supp. 41, 58–59 (D.Me.1987). There has been no showing that Defendant's will was overborne so that the statement was not his own free act. The totality of the circumstances were such that Defendant would believe he was in custody, but they were not any more coercive than any other arrest situation, and no interrogation was conducted. As the Court said in *Miranda,* 384 U.S. at 478, 86 S.Ct. at 1629, "[a]ny statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." [13]

Defendant further argues that the government has mischaracterized the statement made after the warnings were administered, and that its significance would become clear if other statements made at the jail were considered. This is an issue for trial, not one for resolution on a motion to suppress.

### Defendant Norman Panitz

Defendant Norman Panitz has also moved to suppress statements made by him to Special Agent Cunniff when Cunniff came to room 518 of the Sheraton Inn. As previously discussed, Special Agent Cunniff arrested Mr. Suarez and asked Defendant Panitz his name, to which he replied "Norman Panitz." Having heard about a Norman and his brother Bif being in Portland in connection with Goldin, Cunniff, trying to further identify Panitz, asked if he had a brother Bif, to which Panitz replied affirmatively. Soon thereafter Cunniff asked again if Panitz were Bif's brother and he replied "No." Cunniff also asked if Panitz were staying at the Sheraton, to which he replied "No." Cunniff then placed Panitz under arrest. Special Agent Cunniff testified that all of these questions took place in a short span of time and that he was investigating, connecting

---

13. Although Defendant's amended memorandum initially argued that statements made by Haskins at the jail should be suppressed on a number of theories, no evidence was offered concerning statements made at the jail. The Court assumes the government does not intend to use any such statements and will not act on this portion of the motion.

Solomon Panitz and Norman, and formulating an opinion about whether Panitz had committed a crime. Cunniff stated that when Panitz answered affirmatively regarding Bif, "I concluded—again, this happened quickly and I concluded very quickly, after that that I had probable cause and I in fact placed him under arrest within a very, very short time." Tr. 123. The second question about Bif and the question about the Sheraton preceded Cunniff's placing of Defendant Panitz under arrest.

██ Defendant argues that Cunniff was required to administer *Miranda* warnings as soon as he had probable cause. It is clear, however, that the protections of *Miranda* are reserved for persons subjected to custodial interrogation and that custody is to be determined not by the intent of the officers but by the reasonable perceptions of the suspect. In *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984), the Supreme Court addressed a similar situation, stating:

> Although Trooper Williams apparently decided as soon as respondent stepped out of his car that respondent would be taken into custody and charged with a traffic offense, Williams never communicated his intention to respondent. A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.

Here, there is no indication that Panitz would reasonably believe he was not free to go until he was formally placed under arrest. In the few seconds between when Cunniff thought he had probable cause and when he arrested Defendant, Cunniff did not tell him his intentions. Although there were four officers present with Cunniff, they had plainly come to arrest Suarez. The setting was a neutral hotel room, the officers did not have their guns drawn, and

the questioning of Panitz was very brief and uncoercive in nature. The Court finds, therefore, that a reasonable person in Defendant Panitz's situation would not have considered himself in custody. *See United States v. Quinn*, 815 F.2d 153. Therefore, no *Miranda* warnings were required. Moreover, the "general on the scene questioning as to facts surrounding a crime," like that undertaken by Cunniff, was not meant by the Supreme Court to require *Miranda* warnings. *Miranda*, 384 U.S. at 477, 86 S.Ct. at 1629.

### Defendant Hertz

██ Trooper Curran, another state police officer, and Agent Bryfonski stopped Defendant Hertz while he was driving a gold Mercedes with Defendants Frisone and Lopopolo as passengers. Another cruiser stopped with them and a third arrived soon thereafter. The officers had been informed that the occupants might be armed, and they had seen what they construed as a furtive movement, so they approached with drawn guns and had extra cruisers on the scene.[14] The occupants were removed from the car at gunpoint, with their hands up, without the usual request by Trooper Curran indicating that the stop might be a routine traffic stop. Defendant Hertz was told to assume a spread-eagle position on the back of one of the cars and he was patted down.

Hertz was then informed by Agent Bryfonski that he was conducting a routine drug interdiction program. Bryfonski asked several questions, including under what circumstances he had come to Maine, when he had last used the Mercedes, if he had brought luggage, and if the car were his. Hertz responded to these questions. He then refused to give consent for the officers to search the trunk of the car. They did so anyway, and then Hertz was placed under arrest and advised of his rights. He now seeks to suppress the statements made *before* he was advised of his rights.

---

**14.** Trooper Curran testified that by the time the car was stopped there were seven or eight surveillance vehicles at the scene. Tr. 318. His other testimony indicates that perhaps there were fewer. In any event, it is plain that there was a large number of officers and vehicles present.

The Court finds that a reasonable person in Defendant Hertz's position would have believed himself in custody from the time he was removed from the car at gunpoint. The situation was inherently coercive, with many officers with guns drawn surrounding the car which he was driving. This stop did not have the trappings of a routine traffic stop, so Defendant did not necessarily have reason to believe that any questioning would be brief. He was spread-eagled and patted down. Under these circumstances, Agent Bryfonski's statement that the stop was part of a routine drug interdiction program could not have allayed a reasonable person's impression that the situation imposed restraints comparable to those of a formal arrest, *i.e.*, that he was in custody. *See Berkemer v. McCarty*, 468 U.S. at 441, 104 S.Ct. at 3151. Under the circumstances of this arrest, Agent Bryfonski should have administered *Miranda* warnings before he questioned Defendant Hertz. His failure to do so requires that the Court suppress Defendant Hertz's statements made at the scene of his arrest.

## ORDER

Accordingly, it is hereby ORDERED that Defendant Hertz's motion to suppress his statements made at the scene of his arrest prior to being given a *Miranda* warning is hereby GRANTED, and his statements are hereby SUPPRESSED. Defendant Hertz's motion to suppress evidence and the motions to suppress evidence and statements of all the other Defendants, except Defendant Berzon's motion to suppress statements, are hereby DENIED.

So ORDERED.