UNITED STATES of America, Appellee,

v.

**Solomon Philip PANITZ,**
**Defendant, Appellant.**

UNITED STATES of America, Appellee,

v.

**Andrew Stewart BAUMWALD,**
**Defendant, Appellant.**

**Nos. 90–1081, 90–1082.**

United States Court of Appeals,
First Circuit.

Heard June 5, 1990.

Decided July 13, 1990.

Richard E. Mischel, New York City, for appellant Solomon Philip Panitz.

Martin D. Boudreau and Boudreau, Burke, McMenimen & Barber, Boston, Mass., on brief, for appellant Andrew Stewart Baumwald.

Margaret D. McGaughey, Asst. U.S. Atty., with whom Richard S. Cohen, U.S. Atty., Portland, Me., and William H. Browder, Jr., Asst. U.S. Atty., Bangor, Me., were on brief, for the U.S.

Before CAMPBELL, Circuit Judge, COFFIN, Senior Circuit Judge, and SELYA, Circuit Judge.

SELYA, Circuit Judge.

Stung by a sting, defendants Solomon Philip Panitz and Andrew Stewart Baumwald received little balm from the United States District Court for the District of Maine. After that court denied various pretrial motions, each defendant pled guilty, conditionally, *see* Fed.R.Crim.P. 11(a)(2), and then appealed. Finding no prescription for the soothing unguent of reversal, we affirm the judgments below.

## I. BACKGROUND

We set forth the general background of the sting and then particularize appellants' involvement, mindful that the essential facts are not seriously disputed.

### A. *The Sting.*

In November 1988, with the aid of two informants (0010 and 0011), the Coast Guard intercepted and seized 10,000 pounds of Colombian marijuana on the high seas. The marijuana was taken first to Puerto Rico, then to Maine. At that point, a Drug Enforcement Administration (DEA) agent had 0011 call the suspected smuggler of the illicit shipment, one Michael Goldin, to announce that the contraband had arrived as scheduled. Entourage in tow, Goldin

flew to Boston on November 20, rented a car in an assumed name, drove to Maine, and registered at a local hotel (using the same alias).

A team of federal and state officers awaited his arrival. Informant 0011 introduced Goldin to Bansmer, an undercover operative. Bansmer took Goldin to a purported "stash house" near Newcastle, Maine. Goldin inspected the marijuana, stated that he had a list of twelve potential buyers, and took samples for display. The next day Goldin told one of the informants that six customers, identified by first name or description only, were en route to Maine. He also stated that he was still soliciting clients.

Blissfully unaware that he was dealing with a gang composed exclusively of federal and state lawmen, Goldin devised a plan for distributing the marijuana. He would make a series of vehicles available to his accomplices (agents all), turning over the keys. The agents would drive each vehicle, as received, to the place where the marijuana was being stored,[1] stuff it with whatever amount of marijuana Goldin specified, park at a prearranged spot, and return the keys to Goldin. The smuggler would then complete the transaction with the customer, exchanging the drug-laden vehicle for the balance of the agreed price.

Unbeknownst to Goldin, the agents added a new chapter to his script: the loaded vehicles were kept under constant surveillance. When a vehicle was claimed and driven away, it was followed. At a point sufficiently distant from the scene that the "real" criminals (like Goldin and the remaining customers) were unlikely to be alerted, a traffic stop would be accomplished by uniformed officers, the vehicle's occupants arrested, the vehicle searched, and the contraband repatriated. No arrest or search warrants were procured.

### B. *Appellants' Involvement.*

We move now from the general to the particular. On November 21, Goldin told one of the undercover agents that Baumwald had arrived in Maine, accompanied by two confederates, and had given Goldin two sets of car keys—keys to a BMW and a Ford, respectively. Although Baumwald had already paid for the marijuana, delivery was deferred until the next day at the agents' behest. On November 22, Goldin handed over both sets of keys. The automobiles were driven away from the base hotel (where Baumwald had taken a room), stocked with marijuana, and returned to the hotel parking lot.

At 1:30 p.m. on November 22, one of Baumwald's companions, Antonia Dinolfo, entered the Ford and proceeded to drive south on the Maine Turnpike. She was stopped and arrested at a predetermined point. The car was searched and the marijuana seized. About an hour later, Baumwald and his remaining cohort, Rosen, entered the BMW. Surveillance officers followed them south on the Maine Turnpike to Mile 24, where the scenario was reenacted.

Early that evening, Goldin gave the keys to a Chevrolet to an agent, with instructions for loading. The automobile was returned to the hotel parking lot at about 8:30 p.m. It was not immediately retrieved. Shortly after midnight, the agents chose to reveal their identity to Goldin.[2] Caught dead to rights, he agreed to cooperate. At that time, Goldin told the lawmen that Panitz and his brother had come to Maine. The Chevrolet remained under surveillance. An hour or two later, Solomon Panitz entered the car and drove it away. When stopped, it was searched and the 10 bales of marijuana reclaimed.

## II. PROCEEDINGS BELOW

The sting operation gave rise to multiple indictments. Panitz was charged with con-

---

**1.** In truth, the DEA agents stockpiled the marijuana shipment at the Maine state police barracks. As we have said, "irony is no stranger to the law." *Amanullah v. Nelson,* 811 F.2d 1, 18 (1st Cir.1987).

**2.** Up to that point, seven persons (including Baumwald, Rosen, and Dinolfo) had been ar-

rested. Several more people, including Solomon Panitz and his brother, Norman, were arrested after Goldin agreed to cooperate. Because none of the codefendants are parties to these appeals, we refrain from discussing either their involvement or the specific charges against them.

spiracy to distribute in excess of 50 kilograms of marijuana in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), 846, and with the related substantive offense, possession of more than 50 kilograms of marijuana in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C). Baumwald was charged with the same types of crimes in a separate indictment. Both men were also charged with aiding and abetting. 18 U.S.C. § 2. By order of the district court, pretrial proceedings in all cases involving Goldin's customers were deemed consolidated.

Though a flood of pretrial motions ensued, only two sets are germane to these appeals. Early on, defendants moved to dismiss the indictments by reason of outrageous government misconduct and sought an evidentiary hearing in connection therewith. The district court denied the motions. *United States v. Baumwald*, No. 89–00002, slip op. (D.Me. June 19, 1989) (unpublished) (*Baumwald I*). Motions to suppress physical evidence were also filed. A suppression hearing was held on June 21. The court thereafter issued a memorandum denying the motions. *United States v. Baumwald*, 720 F.Supp. 226 (D.Me.1989) (*Baumwald II*). Eventually, both Panitz and Baumwald pled guilty, conditionally, to the conspiracy counts with which they were charged. We consolidated the resultant appeals for briefing and oral argument.

## III. THE AUTOMOBILE SEARCHES

Both appellants assign error to the denial of suppression motions questioning the lawfulness *vel non* of the automobile searches. As described in Part I(B), *supra*, the officers, without obtaining warrants, searched both Panitz's Chevrolet and the BMW in which Baumwald was travelling. Although the searches occurred at different times and involved different vehicles, they share a common provenance and the same legal principles control.

Defendants' lament has three parts. The first posits the absence of "exigent circum-

stances" sufficient to justify the warrantless searches. *See generally United States v. Curzi*, 867 F.2d 36, 41–43 (1st Cir.1989) (discussing "exigent circumstances" doctrine); *United States v. Cresta*, 825 F.2d 538, 553–54 (1st Cir.1987) (similar), *cert. denied*, 486 U.S. 1042, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988). The second segment asserts that if any exigency existed it was manufactured by the government, ergo, unworthy of consideration. *See generally Curzi*, 867 F.2d at 43 n. 6 ("Circumstances deliberately created by the police themselves cannot justify a warrantless search."); *United States v. Thompson*, 700 F.2d 944, 950 (5th Cir.1983) (similar; listing other cases). The last subpart of the thesis suggests that, despite the agents' lack of particularized advance knowledge about who would be retrieving the drug-laden vehicles, they should at the very least have secured "anticipatory" search warrants. *See generally United States v. Garcia*, 882 F.2d 699, 702–04 (2d Cir.) (discussing government's use of anticipatory search warrants), *cert. denied*, —— U.S. ——, 110 S.Ct. 348, 107 L.Ed.2d 336 (1989); *United States v. Hale*, 784 F.2d 1465, 1468–69 (9th Cir.) (similar), *cert. denied*, 479 U.S. 829, 107 S.Ct. 110, 93 L.Ed.2d 59 (1986).

■ We find these lyrics, though sung with great gusto, to be out of harmony with both the facts and the law. Factually, the record tends to support the district court's thesis that the vehicle searches were accomplished under sufficiently exigent circumstances, not deliberately created by the government, to justify forgoing a trip to the magistrate. *See Baumwald II*, 720 F.Supp. at 230–31. We need not discuss the facts at length, however, because the thesis is flawed in a more fundamental sense. Each of appellants' asseverations depends on the premise that a warrantless search of the vehicles could only be made if exigent circumstances existed. Because that premise is faulty, the arguments collapse of their own weight.[3]

---

**3.** While we need not address appellants' "anticipatory search warrant" construct, we note in passing that the federal cases they cite concern defendants who complained about the govern-

ment's decision to seek a warrant in anticipation that a forecast set of facts would materialize. *See, e.g., Hale,* 784 F.2d at 1468 (approving practice where there is probable cause to be-

■ Generally speaking, warrantless searches require both probable cause—that is, a well founded conclusion "that an offense has been committed and ... sound reason to believe that a particular search will turn up evidence of it," *United States v. Aguirre*, 839 F.2d 854, 857–58 (1st Cir. 1988)—and the presence of exigent circumstances. In the instant case, defendants concede that the agents had probable cause to stop the cars and to think that they contained large quantities of marijuana (indeed, other agents had hidden the contraband in the automobiles). The question then becomes whether, absent some demonstrated, non-manufactured exigency, probable cause alone can justify the search of an automobile stopped in transit.

It is clear that, under the "vehicle exception" to the Fourth Amendment's warrant requirement, the necessary predicate for law enforcement officers' warrantless search of a motor vehicle is that they have probable cause to believe that the car contains contraband or other evidence of criminal activity. *See Carroll v. United States*, 267 U.S. 132, 153–56, 45 S.Ct. 280, 285–86, 69 L.Ed. 543 (1925). Although exigent circumstances may at one time, in some fora, have also been required to ground a vehicle search, *see, e.g., United States v. Spetz*, 721 F.2d 1457, 1470–72 (9th Cir.1983), the Court's opinions over the last decade, taken in the aggregate, seem to have set the subject to rest. *See California v. Carney*, 471 U.S. 386, 392, 105 S.Ct. 2066, 2070, 85 L.Ed.2d 406 (1985) ("the pervasive schemes of [vehicular and highway] regulation, which necessarily lead to reduced expectations of privacy, and the exigencies attendant to ready mobility justify searches without prior recourse to the authority of a magistrate so long as the overriding standard of probable cause is met"); *Michigan v. Thomas*, 458 U.S. 259, 261, 102 S.Ct. 3079, 3081, 73 L.Ed.2d 750 (1982) (per curiam) (warrantless search proper even after

"the car has been immobilized; [the justification] does [not] depend upon a reviewing court's assessment of the likelihood in each particular case that the car would have been driven away, or that its contents would have been tampered with, during the period required for the police to obtain a warrant"); *see also United States v. Johns*, 469 U.S. 478, 484, 105 S.Ct. 881, 885, 83 L.Ed.2d 890 (1985); *United States v. Ross*, 456 U.S. 798, 807 n. 9, 102 S.Ct. 2157, 2163 n. 9, 72 L.Ed.2d 572 (1982). The inherent mobility of motor vehicles, *Carney*, 471 U.S. at 390, 105 S.Ct. at 2068, and the reduced expectation of privacy associated with them, *id.* at 391, 105 S.Ct. at 2069, justify application of the vehicular exception "[e]ven in cases where an automobile [is] not immediately mobile." *Id.*

As the Court's position has crystallized, the lower federal courts, by and large, have come to conclude, often *sub silentio*, that so long as the vehicle search is supported by probable cause, no particular exigency (beyond the inherent mobility of *any* motor vehicle) need exist. *See, e.g., United States v. Cruz*, 834 F.2d 47, 51–52 (2d Cir.1987), *cert. denied*, 484 U.S. 1077, 108 S.Ct. 1056, 98 L.Ed.2d 1018 (1988); *Autoworld Specialty Cars, Inc. v. United States*, 815 F.2d 385, 389 (6th Cir.1987); *United States v. Bagley*, 772 F.2d 482, 491 (9th Cir.1985) (overruling *Spetz, supra*), *cert. denied*, 475 U.S. 1023, 106 S.Ct. 1215, 89 L.Ed.2d 326 (1986); *United States v. Swingler*, 758 F.2d 477, 489–90 (10th Cir. 1985); *United States v. $29,000—U.S. Currency*, 745 F.2d 853, 854–55 (4th Cir.1984); *United States v. Sawyer*, 630 F.Supp. 889, 891 n. 5 (D.Me.1986) (Cyr, J.); *United States v. Chapdelaine*, 616 F.Supp. 522, 528–29 (D.R.I.1985), *aff'd mem.* 795 F.2d 75 (1st Cir.1986); *but cf. United States v. Alexander*, 835 F.2d 1406, 1410–11 (11th Cir.1988) (leaving question open); *United States v. Hepperle*, 810 F.2d 836, 840 (8th

lieve contraband is "on a sure course" to a known destination). Appellants have directed us to no federal case purporting to *require* that the government obtain an anticipatory search warrant. Contrary to appellants' suggestion, the mere fact that the DEA may have had time to obtain anticipatory warrants is not dispositive

of any relevant issue. *Cf., e.g., United States v. Rabinowitz*, 339 U.S. 56, 66, 70 S.Ct. 430, 435, 94 L.Ed. 653 (1950) ("The relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable.").

Cir.) (implying that some minimal showing of exigency may be required), *cert. denied*, 483 U.S. 1025, 107 S.Ct. 3274, 97 L.Ed.2d 772 (1987). The court below, reasoning in the way indicated by the weight of modern authority, ruled "that probable cause alone suffices to justify the warrantless search of a vehicle," *Baumwald II*, 720 F.Supp. at 230, and rebuffed defendants' plea that exigent circumstances were also required. We agree.

This court has already rejected the need for an independent showing of exigency, at least by implication. Thus, in *United States v. Moscatiello*, 771 F.2d 589 (1st Cir.1985), *vacated in part on other grounds*, 476 U.S. 1138, 106 S.Ct. 2241, 90 L.Ed.2d 688 (1986), we affirmed the warrantless search of a truck, effected some 18 hours after it had been seized and impounded. *Id.* at 595, 600. In *United States v. McHugh*, 769 F.2d 860 (1st Cir. 1985), we upheld the warrantless search of a vehicle a week after its seizure, stating that: "Once probable cause existed to believe that contraband was being concealed and illegally transported in the pick-up truck, the search could properly have been conducted without a warrant." *Id.* at 865. Today, we make explicit what *Moscatiello* and *McHugh* so plainly implied: the existence of probable cause justifies a warrantless seizure and reasonable search of a motor vehicle lawfully stopped in transit or parked in a public place, whether or not exigent circumstances prevailed at either the time of the seizure or the time of the search. Moreover, the search, so long as reasonable in scope, need not be conducted contemporaneously with the seizure, *see*, *e.g.*, *McHugh*, 769 F.2d at 865, or at the seizure site, *see*, *e.g.*, *Thomas*, 458 U.S. at 261, 102 S.Ct. at 3080. "In short, the lawful (warrantless) search of a vehicle is restricted neither temporally nor spatially." *Chapdelaine*, 616 F.Supp. at 529.

That ends the matter. Because defendants do not challenge the district court's finding that the police had probable cause

to stop the vehicles, search them, and arrest the occupants, it is immaterial whether exigent circumstances were present.

## IV. THE OUTRAGE CLAIM

■ Panitz complains that the government's conduct of the sting operation was so outrageous that it infracted his constitutionally assured right to due process of law.[4] The district court resolved this claim on alternate grounds: defendants' lack of standing, *Baumwald I* at 7–8, and the absence of governmental conduct "go[ing] beyond fundamental fairness." *Id.* at 6. Because either of these findings is fully dispositive of Panitz's contention, we choose to address only the latter, more substantive point.

The Supreme Court has not foreclosed the possibility that the government's active participation in a criminal venture may be of so shocking a nature as to violate a defendant's right to due process, notwithstanding the defendant's predisposition to commit the crime. *See United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973); *see also Hampton v. United States*, 425 U.S. 484, 491–95, 96 S.Ct. 1646, 1650–53, 48 L.Ed.2d 113 (1976) (Powell, J., concurring); *id.* at 495–500, 96 S.Ct. at 1652–55 (Brennan, J., dissenting). While acknowledging the possibility that the government might in some hypothetical circumstances go too far, we have yet to review a situation where official conduct crossed the constitutional line; rather, an unbroken string of First Circuit cases has repulsed attempts to win dismissal of criminal charges on such a theory. *See*, *e.g.*, *United States v. Porter*, 764 F.2d 1, 8 (1985); *United States v. Rodriquez Ramos*, 704 F.2d 17, 22 (1st Cir.), *cert. denied*, 463 U.S. 1209, 103 S.Ct. 3542, 77 L.Ed.2d 1391 (1983); *United States v. Parisi*, 674 F.2d 126, 127 (1st Cir.1982); *United States v. Caron*, 615 F.2d 920, 921 (1st Cir.1980); *United States v. Johnson*, 565 F.2d 179, 181 (1st Cir.1977), *cert. de-*

---

4. Although Baumwald's conditional guilty plea reserved the right to appeal on this ground, his brief makes no mention of the issue. He has, therefore, abandoned it. *See United States v.*

*Zannino*, 895 F.2d 1, 17 (1st Cir.) (issues not briefed are waived), *cert. denied*, —— U.S. ——, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990).

*nied,* 434 U.S. 1075, 98 S.Ct. 1264, 55 L.Ed.2d 780 (1978). This case fits comfortably within the same precedential sphere.

The conduct challenged here—the DEA's interception and seizure of the drugs, its employment of government resources and facilities to complete the smuggle and bring the contraband to Maine, its use of informants as go-betweens, and its casting of constables to play the parts of gang members—does not come close to the level of egregious unacceptability that would be necessary to implicate the Due Process Clause. The reverse appears true: the structuring and implementation of the sting operation seems appropriate under the totality of the proven circumstances. *See, e.g., United States v. Gianni,* 678 F.2d 956, 959–60 (11th Cir.) (government's delivery and sale of marijuana to willing buyers for large sums of cash does not constitute outrageous conduct), *cert. denied,* 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982). The agents did not invent the crime and entice others to commit it. They had traced two earlier loads of smuggled marijuana to Goldin. The intercepted shipment was to have been the third. By bringing the drugs into the country and acting out the preconceived roles of smuggler's accomplices, the lawmen simply set the stage so that a marijuana importer and his customers could do what they had planned all along to do. As to Panitz in particular, the authorities did nothing more than afford him the opportunity to take part in a preplanned crime. He leapt at the chance, unpropelled by police coercion or impermissible inducement. He was, in the Court's phrase, an "unwary criminal," not an "unwary innocent." *Russell,* 411 U.S. at 436, 93 S.Ct. at 1645.

In the ongoing struggle between law enforcers and the underworld, the use of ingenuity is not foreclosed to the government. The police may, within reason, employ guile and clever tactics. When investigating narcotics enterprises, such stratagems are frequently the option of choice; by their very nature, drug rings are extremely difficult to penetrate and detect without undercover intrusion. Not surprisingly, then, courts have consistently recognized that greater government involvement is allowable in such cases. *See, e.g., id.* at 432, 93 S.Ct. at 1643; *Porter,* 764 F.2d at 8. Law enforcement need not play the pantywaist when drug smuggling is afoot: the government may feint and weave, masking its intentions before striking hard—but not foul—blows.

In sum, the law enforcement practices utilized in this case were neither fundamentally unfair nor offensive to principles of due process. Government infiltration of criminal activity, after all, is a "recognized and permissible means of investigation." *Russell,* 411 U.S. at 432, 93 S.Ct. at 1643. The DEA's elaborate ruse, acting out the script that Goldin authored, fails to shock—or even to vellicate—our collective conscience.

■ Panitz's claim that he was wrongfully denied an evidentiary hearing is equally unavailing. It is self-evident that "[d]istrict courts are busy places and makework hearings are to be avoided." *United States v. Cannons Engineering Corp.,* 899 F.2d 79, 94 (1st Cir.1990); *see also Aoude v. Mobil Oil Corp.,* 892 F.2d 1115, 1120 (1st Cir.1989) ("motions do not usually culminate in evidentiary hearings"). It follows that, like other litigants, a criminal defendant has no absolute or presumptive right to insist that the district court take testimony on every motion. *See, e.g., United States v. Pellerito,* 878 F.2d 1535, 1545 (1st Cir.1989) (accused has "no *automatic* entitlement to a competency hearing" merely because he moves for one); *United States v. DeCologero,* 821 F.2d 39, 44 (1st Cir. 1987) ("hearings cannot be convened at the whim of a suitor"); *cf. United States v. O'Brien,* 895 F.2d 810, 817 (1st Cir.1990) ("[w]e decline to require a district court to hold a [*Nebbia*] hearing every time the government requests one"). The test for granting an evidentiary hearing in a criminal case should be substantive: did the defendant make a sufficient threshold showing that material facts were in doubt or dispute? *See Delaware v. Franks,* 438 U.S. 154, 155–56, 171–72, 98 S.Ct. 2674, 2676–77, 2684–85, 57 L.Ed.2d 667 (1978) (requiring "substantial preliminary show-

ing" of knowing falsity and materiality antecedent to evidentiary hearing on truthfulness of affidavit used to secure warrant); *United States v. Paradis*, 802 F.2d 553, 558 (1st Cir.1986) (same); *United States v. Slocum*, 708 F.2d 587, 600 (11th Cir.1983) (evidentiary hearing on claimed *Brady* infraction properly denied where defendants failed to make prima facie showing of harmful violation); *United States v. Wojtowicz*, 550 F.2d 786, 790 (2d Cir.) (competency hearing required only if defendant has presented "sufficiently detailed and controverted factual allegations" which, if true, would warrant finding of incompetency), *cert. denied*, 431 U.S. 972, 97 S.Ct. 2938, 53 L.Ed.2d 1071 (1977).

There was no abuse of discretion in rejecting the request for an evidentiary hearing on the issue of outrageousness. The material facts were not in dispute. According to the proffer below and Panitz's brief on appeal, defendants thought a factfinding hearing might shed light in three areas: (1) the degree of governmental involvement in the sting and the amount of public funds expended; (2) Goldin's status, including when he became an informant; and (3) the timing of the customers' participation in the operation. The first and third points seem wholly superfluous. The record leaves no doubt but that the DEA orchestrated the sting from the moment the marijuana shipment was intercepted[5] until some time after Panitz was arrested. The government's involvement was considerable; the details of that involvement—how many agents were used or how much money was spent—make no meaningful difference. By the same token, Panitz has not indicated in what way the involvement of Goldin's other customers—involvement which, in any event, is well defined in the existing record—had any bearing on his situation.

Goldin's status is, of course, a horse of another color. But there is not a whisper of a hint of an intimation that Goldin became aware of the DEA's presence, and began cooperating, at any time before the early morning hours of November 22—well after the Chevrolet had been driven to Maine, turned over to Goldin, and loaded with marijuana. Appellant's suggestion that perhaps Goldin was cooperating at an earlier date is unanchored in any fragment of discernible fact. A district court is not obliged to schedule an evidentiary hearing on the basis of conclusory allegations, vague insinuations, unsupportable inferences, rank speculation, opprobrious epithets, or any combination of the foregoing. Because Goldin's role was not legitimately in doubt, testimony was not required. *See Franks*, 438 U.S. at 171, 98 S.Ct. at 2684 ("To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross examine."); *Pellerito*, 878 F.2d at 1545 (movant has the obligation "to justify holding an evidentiary hearing").

## V. CONCLUSION

We need go no further. "Injustice is relatively easy to bear; what stings is justice." H.L. Mencken, *Prejudices, Third Series* (1922). There was no injustice here. The judgments below should be, and hereby are,

*Affirmed.*

---

**5.** Panitz has not suggested that the government's involvement began earlier, or that the DEA arranged to have the marijuana sent from Colombia.