USCA1 Opinion

 

 April 16, 1993 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT No. 91-1890 UNITED STATES OF AMERICA, Appellee, v. MICHAEL BARNETT, Defendant, Appellant. _____________________ No. 91-1891 UNITED STATES OF AMERICA, Appellee, v. BARRY JORDAN, Defendant, Appellant, _____________________ No. 92-1778 UNITED STATES OF AMERICA, Appellee, v. BARRY JORDAN, Defendant, Appellant. ____________________ ERRATA SHEET The opinion of this Court issued March 29, 1993, is amended as follows: Page 22, line two of text after block quote, should read: . . . 476 U.S. 1115 (1986) . . . . April 7, 1993 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 91-1890 UNITED STATES OF AMERICA, Appellee, v. MICHAEL BARNETT, Defendant, Appellant. _____________________ No. 91-1891 UNITED STATES OF AMERICA, Appellee, v. BARRY JORDAN, Defendant, Appellant, _____________________ No. 92-1778 UNITED STATES OF AMERICA, Appellee, v. BARRY JORDAN, Defendant, Appellant. ____________________ 3 ERRATA SHEET The opinion of this Court issued March 29, 1993, is amended as follows: Page 28, last line of text, should read: . . . since there were none. March 29, 1993 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 91-1890 UNITED STATES OF AMERICA, Appellee, v. MICHAEL BARNETT, Defendant, Appellant. _____________________ No. 91-1891 UNITED STATES OF AMERICA, Appellee, v. BARRY JORDAN, Defendant, Appellant, _____________________ No. 92-1778 UNITED STATES OF AMERICA, Appellee, v. BARRY JORDAN, Defendant, Appellant. ____________________ 5 APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Joseph L. Tauro, U.S. District Judge] ___________________ ____________________ Before Breyer, Chief Judge, ___________ Cyr and Boudin, Circuit Judges. ______________ ____________________ Gayle C. Wintjen with whom McGuinness & Parlagreco was on brief _________________ ________________________ for appellant Michael Barnett. George F. Gormley for appellant Barry Jordan. _________________ Joseph M. Walker III, Assistant United States Attorney, with whom _____________________ A. John Pappalardo, United States Attorney, was on brief for appellee. __________________ ____________________ March 29, 1993 ____________________ CYR, Circuit Judge. Appellants Michael Barnett and Barry Jordan CYR, Circuit Judge. _____________ were charged, in a three-count indictment, with conspiracy to manufac- ture and possess with intent to distribute methamphetamine in viola- tion of 21 U.S.C. 846, possession with intent to distribute metham- phetamine in violation of 21 U.S.C. 841(a) (1), and possession of a listed chemical in violation of 21 U.S.C. 841(d)(1). Barnett was convicted on all three counts at trial; Jordan pleaded guilty to all three counts shortly after the commencement of trial. Each was sentenced to a thirty-year prison term and a ten-year term of super- vised release. On appeal, Barnett raises several challenges to his conviction, and joins Jordan in contesting the drug-quantity finding made by the district court at sentencing. We affirm. I I BACKGROUND BACKGROUND __________ In March 1990, the United States Drug Enforcement Agency ("DEA") began investigating a suspected conspiracy to manufacture and distrib- ute methamphetamine. Surveillance was initiated at three sites in the Scituate, Massachusetts area: the residences of each appellant and the residence of their codefendant, Timothy Fitzgerald.1 Approximately a year before the investigation began, a trailer storage company had delivered a forty-foot trailer to Fitzgerald's ____________________ 1Fitzgerald was acquitted at trial. 3 residence in Scituate. The employee who made the delivery later testified that the recipient of the trailer, known to him as "Tim," instructed that the trailer be placed as far back as possible into the woods located on the property. Barnett subsequently rented the trailer from Fitzgerald. In early May, 1990, undercover DEA Agent John Kelly offered to sell Jordan hydriodic acid ostensibly stolen by Kelly.2 At their meeting, Jordan explained that his "chemist" had enough pseudoephed- rine to produce forty pounds (eighteen kilograms) of methamphetamine, but needed twenty pints of hydriodic acid for the manufacturing process. During their tape-recorded conversation, Jordan agreed to buy twenty pints of hydriodic acid, and to provide Kelly with four ounces of methamphetamine in return. Jordan assured Kelly that he would receive four "uncut" ounces, and suggested that Kelly could double the volume by diluting the pure methamphetamine with an equal amount of "cut," then sell the resulting eight ounces for $2,000 an ounce. Jordan described the methamphetamine manufacturing process to Kelly, explaining that it took seven to eight days, and that his chemist produced ten pounds of methamphetamine in each batch. To allay Kelly's concern about the danger of a laboratory explosion, ____________________ 2Hydriodic acid, a listed chemical, is essential to methamphet- amine production using the "ephedrine reduction process," which also requires either ephedrine or pseudoephedrine; red phosphorus may also be used as a purifying agent. To convert the methamphetamine into powder for distribution, it is dissolved into freon liquid, then bubbled in hydrogen chloride gas. 4 Jordan explained that his chemist had been manufacturing methamphet- amine for ten years, and volunteered that he had assisted the chemist in preparing eight to ten batches one summer.3 As promised, on May 16, 1990, Kelly delivered two boxes contain- ing twenty half-liter bottles (approximately twenty pints) of hyd- riodic acid to Jordan. A different DEA agent followed Jordan to Barnett's residence, where he observed Jordan and Barnett unloading two boxes from the trunk of Jordan's car. The DEA conducted a series of aerial surveillance fly-overs during May 1990. A fly-over of the Fitzgerald residence on or about May 27 revealed an electrical power cord running from the main house to the trailer. (The ephedrine reduction process requires a power source to heat the chemicals.) Two subsequent fly-overs of the Fitzgerald residence were con- ducted using an infrared heat-detecting device which operates in either of two polarity modes: "white-hot" or "black-hot." When the device is in the white-hot mode, objects emitting heat appear white on an attached screen; in the black-hot mode, heat-emitting objects appear black. The device detected no heat emission from the trailer during a fly-over on May 28. On May 30, Massachusetts State Police ____________________ 3After pleading guilty during trial, Jordan submitted an affida- vit in which he insisted that these statements were mere "puffing," intended to convince Kelly that he was willing and able to complete their transaction. The affidavit attests that Jordan knew nothing about the manufacture of methamphetamine, and that his only role in the enterprise was to obtain hydriodic acid in exchange for a small amount of money to support his heroin habit. 5 Trooper Richard Welby, who had relatively little experience with the infrared equipment, conducted another fly-over. Welby, erroneously believing the device was in the white-hot mode, observed that the trailer appeared white on the screen, and concluded that it was emitting heat. Subsequent analysis revealed, however, that the device actually was in the black-hot mode during the May 30 fly-over, and the infrared images, properly interpreted, indicated that the trailer was emitting no detectible heat. On the afternoon of May 30, a DEA agent followed Barnett to the Fitzgerald property. When Barnett disappeared down the driveway, the agent left his vehicle and surreptitiously followed on foot. The agent spotted the trailer and saw Barnett inside. The agent noticed several blue buckets, a white radiator, and two boxes in the rear of the trailer. As the agent watched, Barnett scraped the bottom of one of the blue buckets for approximately five minutes, then poured liquid into the bucket. Barnett left the trailer and entered the main house, returning with several paper towels with which he filtered the yellow slushy contents of the bucket, then poured the filtered substance into a gray painter's tray. Barnett made another trip to the main house, this time returning with clear plastic sandwich bags. He picked up the gray painter's tray, rocked it back and forth several times, then poured the yellow slushy substance into one of the bags, double-bagged it, and returned once again to the main house. The DEA agent returned to his vehicle, and waited for Barnett to drive away. After about twenty-five minutes, Barnett left the 6 Fitzgerald property and drove to a shopping center, unaware that he was being followed by the agent. When the agent pulled into the shopping center parking lot, he noticed a second individual in Bar- nett's vehicle. The agent identified the second individual as appel- lant Jordan. On May 30, DEA Agent Lemon compiled the information obtained from the various surveillance operations (including the erroneous heat- imaging data interpretation) in an affidavit, which he attached to an application for a warrant to search the trailer on the Fitzgerald property, the Fitzgerald and Jordan residences, and a residence believed to be occupied by Barnett. The investigation culminated early the next morning when the search warrants were executed. First, agents searched the Fitzgerald trailer, unveiling a partially assembled laboratory containing an array of chemicals, including hydriodic acid, acetone, freon, and hydrogen chloride gas, and an assortment of equipment associated with methamphetamine production, including a radiator, a fan, flasks, tubes, and a heater-timer. Three ounces of methamphetamine crystals and a bucket containing approximately one pound of methamphetamine crystals in two and one-half pounds of an acetone/freon solution were also discovered. Subsequent analysis determined that the methamphet- amine found in the bucket was between 90 and 100 percent pure. DEA agents arrested Jordan and Fitzgerald at their respective residences. At Jordan's residence, agents seized a small quantity of a mixture containing heroin and methamphetamine, as well as a valium 7 tablet, several hypodermic needles, and several publications describ- ing the methamphetamine manufacturing process. At Fitzgerald's residence, agents found a piece of paper listing the chemical ingredi- ents needed to produce methamphetamine using the ephedrine reduction process ("the Fitzgerald chemical list"). Barnett no longer resided at the residence for which the fourth search warrant had been obtained. When DEA agents arrested Barnett at his new residence, he was advised of his Miranda rights and that the _______ laboratory had been discovered at the Fitzgerald property. Agents searched Barnett's new residence,4 and discovered a warehouse re- ceipt. In response to a question from Agent Lemon about the receipt, Barnett revealed that the remaining equipment and chemicals were in a storage bin at the warehouse. A warrant was secured and the search of the storage bin uncovered approximately fifteen pounds of red phospho- rous, a seventy-pound drum containing an unspecified quantity of hydriodic acid, a fifty-kilogram container of pseudoephedrine slightly less than half full, and various other chemicals, glassware, cooking devices, protective gear and gloves. At DEA headquarters, after determining that Barnett had been advised of his Miranda rights, DEA agent Boeri engaged Barnett in _______ conversation about the methamphetamine operation. In response to Boeri's questions, Barnett admitted that he was the "chemist," indi- cated that he had experienced no difficulty obtaining chemicals, and ____________________ 4Barnett contests the district court ruling that the warrantless search was consensual. See infra at pt. II.B.1. ___ _____ 8 explained that his methamphetamine was "ninety nine and one percent" pure as a consequence of the two "extra" manufacturing steps he performed. Five days into their joint trial, Jordan pleaded guilty to all counts. Thereafter, the jury convicted Barnett, and acquitted Fitzgerald, on all counts. II II DISCUSSION DISCUSSION __________ A. Sentencing Issues A. Sentencing Issues _________________ Barnett and Jordan challenge the sentencing court's determination that each was responsible for twenty-nine kilograms of pure metham- phetamine. Jordan alone contests the court's drug purity ruling. We review for clear error, see 18 U.S.C. 3742(e); United States v. ___ ______________ Panet-Collazo, 960 F.2d 256, 262 (1st Cir.), cert. denied, U.S. _____________ _____ ______ ___ _ , 113 S. Ct. 220 (1992); United States v. Weston, 960 F.2d 212, 220 _____________ ______ (1st Cir. 1992), with a view to whether the factual findings made by the sentencing court were supported by a preponderance of the reliable information. See, e.g., United States v. Rodriguez-Cardona, 924 F.2d ___ ____ _____________ _________________ 1148, 1155 (1st Cir.), cert. denied, U.S. , 112 S. Ct. 54 _____ ______ ____ ____ (1991); United States v. Zuleta-Alvarez, 922 F.2d 33, 37 (1st Cir. _____________ ______________ 1990), cert. denied, ___ U.S. ___, 111 S. Ct. 2039 (1991). _____ ______ 1.Drug Quantity 1.Drug Quantity _____________ The district court adopted the drug-quantity findings set out in 9 the presentence reports ("PSRs").5 Each PSR provided, in relevant part: In this offense, the defendant secured a 50 kilogram drum of pseudoephedrine which would make 29 kilograms of pure metham- phetamine. There was every indication that they had the materials to produce this full amount. As such, the Drug Quantity Table under [s]ubsection (c), offenses involving at least 10 kilograms but less than 30 kilograms of pure metham- phetamine provides for a base offense level of 40. Appellants insist that the court overestimated the capacity of their drug manufacturing operation and that their sentences should have been based exclusively on the quantity of methamphetamine seized. The sentencing guidelines direct that a defendant who is convict- ed of conspiring or attempting to commit any offense involving a controlled substance shall be assigned the same base offense level "as if the object of the conspiracy or attempt had been completed." U.S.S.G. 2D1.4. Further guidance is provided in an application note: Where there is no drug seizure or the amount seized does not __ ___ ______ ______ ____ ___ reflect the scale of the offense, the sentencing judge shall _______ ___ _____ __ ___ _______ approximate the quantity of the controlled substance. In making his determination, the judge may consider, for exam- ple, the price generally obtained for the controlled sub- stance, financial or other records, similar transactions in controlled substances by the defendant, and the size or ___ ____ __ ____________________ 5Appellants mistakenly suggest that the court made no specific finding as to the quantity of drugs for which they were being held responsible. The court checked the box on the "Statement of Reasons" form attached to the judgment relating to each defendant, thereby clearly indicating that "[t]he court adopt[ed] the factual findings and guideline application in the presentence report." We therefore reject their Rule 32(c)(3)(D) claim. 10 capability of any laboratory involved. __________ __ ___ __________ ________ U.S.S.G. 2D1.4, comment. (n.2) (1991) (emphasis added). Three ounces of methamphetamine crystals, and a bucket containing an additional pound of methamphetamine crystals in two and one-half pounds of liquid, were seized. Nevertheless, the district court reasonably concluded that the quantity of methamphetamine seized did not accurately reflect the scale of the offense, see id., especially ___ ___ in view of Jordan's admissions that his "chemist" had at hand the ingredients with which to produce forty pounds of methamphetamine, and in view of the equipment found in the trailer and storage facility, and the sizable quantities of precursor chemicals seized. Accord- ingly, under the sentencing guidelines the district court did not err in estimating the drug quantity. The court based its drug-quantity calculation on the amount of methamphetamine producible with fifty kilograms of pseudoephedrine. Barnett and Jordan object to this calculation because it disregards the undisputed fact that the fifty-kilogram drum contained only twenty-three kilograms of pseudoephedrine when it was seized. More- over, Jordan insists that the court's approximation of the quantity of methamphetamine was flawed because other essential precursor chemicals were not seized in the quantities required to produce twenty-nine kilograms of methamphetamine, in particular hydriodic acid. In approximating the producible quantity of controlled substance, the sentencing court may consider the amount of precursor chemicals 11 possessed. See, e.g., United States v. Beshore, 961 F.2d 1380, 1383- ___ ____ _____________ _______ 84 (8th Cir.), cert. denied, U.S. , 113 S. Ct. 241 (1992), and _____ ______ ___ ___ cert. denied, U.S. , 113 S. Ct. 243 (1992); United States v. _____ ______ ____ ____ _____________ Short, 947 F.2d 1445, 1456-58 (10th Cir. 1991), cert. denied, ___ U.S. _____ _____ ______ ___, 112 S. Ct. 1680 (1992); United States v. Aichele, 941 F.2d 761, _____________ _______ 766 (9th Cir. 1991); United States v. Macklin, 927 F.2d 1272, 1281 ______________ _______ (2nd Cir.), cert. denied, ___ U.S. ___, 112 S. Ct. 146 (1991); United _____ ______ ______ States v. Kingston, 922 F.2d 1234, 1236-38 (6th Cir. 1990), cert. ______ ________ _____ denied, ___ U.S. ___, 111 S. Ct. 2054 (1991); United States v. ______ _____________ Smallwood, 920 F.2d 1231, 1236-38 (5th Cir.), cert. denied, ___ U.S. _________ _____ ______ ___, 111 S. Ct. 2870 (1991). Although the sentencing court must "'err on the side of caution'" in selecting from among plausible alternative drug-quantity estimates, United States v. Sklar, 920 F.2d 107, 113 ______________ _____ (1st Cir. 1990) (quoting United States v. Walton, 908 F.2d 1289, 1301 _____________ ______ (6th Cir.), cert. denied, __ U.S. __, 111 S. Ct. 273 (1990)), we _____ ______ cannot conclude that its approximation is constrained by the precur- sor-chemical quantities actually seized, see Beshore, 961 F.2d at 1383 ___ _______ (approximation of drug quantity "does not require that every precursor chemical be present"). Rather, U.S.S.G. 2D1.4 expressly authorizes consideration of the size or capability of any laboratory. See United ____ __ __________ __ ___ __________ ___ ______ States v. Havens, 910 F.2d 703, 705 (10th Cir. 1990), cert. denied, ______ ______ _____ ______ ___ U.S. ___, 111 S. Ct. 687 (1991) (explaining that a drug-quantity estimate "should be equal to the amount of drugs produceable if the precursor chemicals possessed by the defendant were combined with proportionate amounts of the missing ingredients including processing 12 equipment"); see also United States v. Bertrand, 926 F.2d 838, 846 ___ ____ _____________ ________ (9th Cir. 1991) (finding no clear error in drug-quantity approximation based on capacity of methamphetamine lab, notwithstanding lack of hydriodic acid); Smallwood, 920 F.2d at 1237 (upholding drug-quantity _________ finding notwithstanding absence of precursor chemicals); cf. United ___ ______ States v. Gerante, 891 F.2d 364, 368-70 (1st Cir. 1989) (basing ______ _______ approximation of drug quantity on discovery at defendant's residence of $68,000 believed to be proceeds from recent drug sale). As we see it, the quantity of essential precursor chemicals seized, like the capacity of the laboratory and the evidence relating to the overall scheme, see Smallwood, 920 F.2d at 1237-38, is but one among several ___ _________ circumstantial factors appropriately considered in approximating drug quantities for sentencing purposes. We must determine whether the government presented sufficient reliable information to permit the court reasonably to conclude that appellants were responsible for a quantity of drugs at least equal to the quantity threshold for the assigned base offense level. See ___ Sklar, 920 F.2d at 113. The base offense level assigned each appel- _____ lant was 40, the level applicable to offenses involving between ten and thirty kilograms of unadulterated methamphetamine. A DEA chemist testified at trial that fifty kilograms of pseudoephedrine would yield twenty-nine kilograms of methamphetamine.6 Utilizing the same ratio ____________________ 6Jordan points out that the court did not state that it was relying on the DEA chemist's testimony, that the drug quantity approx- imation in the PSR is not attributed to the chemist, and that Jordan had no opportunity to cross-examine the chemist, who testified after 13 one unit of pseudoephedrine per a .58 unit of methamphetamine the twenty-three kilograms of pseudoephedrine seized in the fifty- kilogram drum would yield approximately thirteen kilograms of metham- phetamine, a quantity sufficient to warrant the base offense level of 40. The DEA chemist further testified that the ephedrine reduction process requires hydriodic acid in quantities from one to four times the amount of pseudoephedrine, depending upon the particular "recipe." Although the evidence does not establish the exact amount of hydriodic acid the defendants possessed, approximately ten liters were seized, along with an unspecified quantity found in a seventy-pound container at the warehouse. In addition, an empty seventy-pound hydriodic acid container was found at the trailer. Furthermore, Jordan admitted to Agent Kelly that he and the "chemist" had all the necessary ingredients, with the exception of the hydriodic acid being procured from Kelly, with which to manufacture forty pounds (eighteen kilograms) of methamphetamine immediately. The court also had before it the Fitzgerald chemical list, reflecting chemical quantities sufficient to produce at least twenty-nine kilo- ____________________ Jordan had entered his guilty plea. "A sentencing hearing need not meet all the procedural safeguards and strict evidentiary limitations of a criminal trial." Zuleta- _______ Alvarez, 922 F.2d at 36. The sentencing court may rely on extrinsic _______ evidence which was not subjected to cross-examination, so long as there are "'sufficient indicia of reliability to support its probable accuracy.'" Id. at 36 (quoting U.S.S.G. 6A1.3). Jordan failed to __ present any evidence at sentencing to refute the drug-quantity approx- imation in the PSR. We discern no clear error in the sentencing court's reliance on the DEA chemist's trial testimony. 14 grams of methamphetamine. Some quantity of each chemical on the list was seized either from the trailer or the warehouse and in the size container specified on the list.7 Appellants' PSRs also contain the uncontroverted statements that Barnett produced approximately eight pounds of methamphetamine in December 1989 and that Jordan participat- ed in its distribution. Neither appellant presented countervailing drug-quantity or chemical-quantity evidence at sentencing. We discern no clear error. The district court had before it sufficient reliable information to support a finding that Barnett and Jordan were actually responsible for not less than ten kilograms of ___ ____ methamphetamine, warranting a base offense level of 40. 2. Drug Purity 2. Drug Purity ___________ An explanatory note appended to the Drug Quantity Table distin- ____________________ 7The Fitzgerald chemical list reads as follows: d-pseudoephedrine Hcl. 50 kilo drum Hydriodic Acid 4 - 70 lb drum Red Phosphorus 15 lb R-IIFreon 7 - 100 lb drums Methyl Alchohol [sic] (methanol) 5 - 5 gal drums Acetone 7 - 5 gal drums Among the seized chemicals were a partially filled fifty-kilogram drum of pseudoephedrine, one empty and one partially filled seventy-pound hydriodic acid drum, several one-pound bottles of red phosphorus, a 100-pound drum of freon, several five-gallon containers of methanol, and two five-gallon acetone containers. 15 guishes between the terms "methamphetamine (actual)" and "metham- phetamine": Unless otherwise specified, the weight of a controlled sub- stance set forth in the table refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance . . . . The term[] . . . "[m]etham- phetamine (actual)" refer[s] to the weight of the controlled substance, itself, contained in the mixture or substance. U.S.S.G. 2D1.1(c). The table prescribes a base offense level of 40 for offenses involving between ten and thirty kilograms of "metham- phetamine (actual)," whereas the same quantity of adulterated "metham- phetamine" carries a base offense level of 36. Now, for the first time, Jordan argues that the record does not establish the purity of the methamphetamine for which he was held responsible, and that his base offense level should have been computed under the Drug Quantity Table entry for adulterated "methamphetamine" rather than "methamphet- amine (actual)." Issues not squarely raised in the district court will not be entertained on appeal. See United States v. Haggert, 980 F.2d 8, 10- ___ ______________ _______ 11 (1st Cir. 1992) (collecting cases). Although defense counsel consistently referred to base offense levels corresponding to adulterated "methamphetamine" rather than "methamphetamine (actual)," both at sentencing and in opposition to the PSR, at no time did he expressly raise drug purity as an issue in the district court. "Judges are not expected to be mindreaders. Consequently, a litigant has an obligation to spell out [his] arguments squarely and distinct- ly, or else forever hold [his] peace." United States v. Zannino, 895 _____________ _______ 16 F.2d 1, 17 (1st Cir.) (internal citations and quotation marks omit- ted), cert. denied, 494 U.S. 1082 (1990). The drug-purity claim must _____ ______ be deemed waived, as it was never raised below.8 B. Suppression Issues B. Suppression Issues __________________ 1. The Consensual Search 1. The Consensual Search _____________________ Barnett filed a pretrial motion to suppress certain physical evidence and admissions, on the ground that he did not voluntarily consent to the warrantless search of his residence. The district court disagreed. We review for clear error. United States v. Wilkin- _____________ _______ son, 926 F.2d 22, 24 (1st Cir.), cert. denied, ___, U.S. ___, 111 S. ___ _____ ______ Ct. 2813 (1991); United States v. Twomey, 884 F.2d 46, 51-52 (1st Cir. _____________ ______ 1989), cert. denied, 496 U.S. 908 (1990). A warrantless residential _____ ______ search violates the Fourth Amendment unless it comes within one of the "'few specifically established and well-delineated exceptions[,]'" ____________________ 8The raise-or-waive rule will be relaxed only in exceptional cases involving a gross miscarriage of justice where the belated claim is "'so compelling as virtually to insure appellant's success.'" Johnston v. Holiday Inns, Inc., 595 F.2d 890, 894 (1st Cir. 1979) ________ ___________________ (quoting Dobb v. Baker, 505 F.2d 1041, 1044 (1st Cir. 1974)); see ____ _____ ___ United States v. Slade, 980 F.2d 27, 31 (1st Cir. 1992); Haggert, 980 _____________ _____ _______ F.2d at 10-11; Hernandez-Hernandez v. United States, 904 F.2d 758, 763 ___________________ _____________ (1st Cir. 1990). This narrow exception is unavailing in the present case. The sentencing court had before it evidence that Barnett per- formed extra manufacturing steps to assure maximum purity, that Jordan promised to deliver "uncut" methamphetamine to Agent Kelly, that Barnett boasted to Agent Boeri that his methamphetamine had been analyzed "ninety-nine and one hundred percent" pure, and that the methamphetamine seized at the trailer was between ninety and one hundred percent pure. Absent any evidence that the methamphetamine was diluted or adulterated in any manner, the sentencing court was presented with insufficient evidence to sustain Jordan's present drug- purity claim. 17 Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (quoting Katz v. ___________ __________ ____ United States, 389 U.S. 347, 357 (1967)), which include consensual _____________ searches, id. at 219, 228. The voluntariness of a consent to search ___ turns on an assessment of the totality of the circumstances. United ______ States v. Mendenhall, 446 U.S. 544, 557 (1980); Schneckloth, 412 U.S. ______ __________ ___________ at 227. Among the individualized factors bearing on the vulnerability of the consenting party are age, education, experience, intelligence, and knowledge of the right to withhold consent. More general consid- erations include whether the consenting party was advised of his or her constitutional rights and whether permission to search was ob- tained by coercive means or under inherently coercive circumstances. Id. at 226; Twomey, 884 F.2d at 51. Although sensitivity to the ___ ______ heightened possibility of coercion is appropriate when a defendant's consent is obtained during custody, see Schneckloth, 412 U.S. at 240, ___ ___________ n.29, "custody alone has never been enough in itself to demonstrate . . . coerced . . . consent to search." United States v. Watson, 423 _____________ ______ U.S. 411, 424 (1976). Barnett argues that his consent was coerced, in that he was met at the door of his home by seven or eight law enforcement officers, with guns drawn. Immediately after he was arrested and handcuffed, the officers holstered their weapons and advised Barnett of his Miranda rights. Barnett was then asked if he would consent to a _______ 18 search of the premises.9 Barnett claims that he was never informed that he could withhold his consent, he was given no consent form, and he was led to believe that the officers already had a search warrant because they began searching the premises immediately upon entering, prior to requesting consent. Written consent is not essential to the establishment of a valid consensual search. See, e.g., United States v. Chaidez, 906 F.2d 377, ___ ____ _____________ _______ 382 (8th Cir. 1990) (search may be justified by voluntary oral consent even in the absence of valid written consent); United States v. ______________ Castillo, 866 F.2d 1071, 1082 (9th Cir. 1988) (defendant's refusal to ________ sign a consent form does not preclude a finding of voluntariness). Moreover, it is not essential that the officers first inform the consenting party of the right to withhold consent, though knowledge of the right to withhold consent is a factor to be considered in assess- ing voluntariness, Schneckloth, 412 U.S. at 227; see also Florida v. ___________ ___ ____ _______ Rodriguez, 469 U.S. 1, 6-7 (1984). _________ Although Barnett testified that agents began "searching, looking under things," and "opening drawers and cabinets," Lemon testified ____________________ 9Barnett testified that, following his arrest, he was told by Agent Lemon: "Mike, we are just going to look around and take you down to the Marshfield Police Station, okay?" Barnett replied, "Okay." Barnett contends that he was merely acknowledging his arrest and inevitable booking, not consenting to a search of his residence. Based on Agent Lemon's testimony, however, the court found that Barnett was asked: "Mind if I look around the house?" and responded, "Go ahead. You'd probably get a search warrant anyway." The district court was presented with a pure credibility determination. We find no clear error in its determination that Lemon's version of the events was more credible. 19 that a protective sweep was conducted immediately upon entering the __________ _____ premises to ensure that no one else was present.10 Thereafter, ac- cording to Lemon, the agents "just [stood] around" until Barnett consented to a further search. We find no clear error in the trial court's credibility-based ruling that "a sweep search was conducted." Barnett's contention that the search conducted immediately upon entry led him to believe that the agents already had a search warrant cannot succeed in any event. The district court expressly found that Barnett responded as follows to Lemon's request for consent to search: "Go ahead. You'd probably get a search warrant anyway[]" (emphasis ______ _______ ______ added), plainly implying Barnett's understanding that the agents had no search warrant and needed his consent. Notwithstanding the inherently unnerving effect of having numer- ous officers arrive at one's door with guns drawn, Barnett was no "newcomer" to law-enforcement encounters. See United States v. ___ ______________ Kimball, 741 F.2d 471, 474 (1st Cir. 1984). Barnett had been convict- _______ ed of at least eighteen prior offenses and arrested on at least eight previous occasions. Thus, we may fairly presume that he was "less likely than most to be intimidated by the agents' show of force." United States v. Cepulonis, 530 F.2d 238, 244 (1st Cir. 1976), cert. _____________ _________ _____ ____________________ 10A sweep search is "narrowly confined to a cursory visual inspection of those places in which a person might be hiding," Mary- _____ land v. Buie, 494 U.S. 325, 327 (1990). The officers are permitted to ____ ____ take reasonable steps to ensure their safety, and may, "without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." Id. ___ 20 denied, 426 U.S. 908 (1976), and cert. denied, 426 U.S. 922 (1976). ______ _____ ______ In addition, before he was asked to consent to the search, all guns had been holstered and Barnett was advised of his Miranda rights, _______ "'put[ting] him on notice that he [could] refuse to cooperate,'" id. ___ (quoting Gorman v. United States, 380 F.2d 158, 164 (1st Cir. 1967)). ______ _____________ Finally, there was no evidence of overt or covert threats or pressure to exact Barnett's consent. In these circumstances, we conclude that Barnett's will was not overborne, nor his "capacity for self-determination critically im- paired." Schneckloth, 412 U.S. at 225. Ultimately, as we are not ___________ "'left with the definite and firm conviction that a mistake has been committed,'" Anderson v. Bessemer City, 470 U.S. 564, 573 (1985) ________ ______________ (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 _____________ ________________________ (1948)), we find no clear error in the trial court's determination that Barnett's consent was voluntary. 2. The Lemon Affidavit 2. The Lemon Affidavit ___________________ Next, Barnett claims that the district court erred in refusing to suppress evidence obtained as a result of alleged false statements in the affidavit supporting the search warrant application. Barnett contends that the erroneous heat-imaging test data in the Lemon affidavit was materially false or included with reckless disregard for its truth. Without it, says Barnett, the Lemon affidavit was insuffi- cient to establish probable cause to search the trailer. The district court conducted an evidentiary hearing pursuant to 21 Franks v. Delaware, 438 U.S. 154 (1978). Franks findings are reviewed ______ ________ ______ for clear error. United States v. Cole, 807 F.2d 262, 268 (1st Cir. ______ ______ ____ 1986), cert. denied, 481 U.S. 1069 (1987). The questions for us are _____ ______ (1) whether Barnett established by a preponderance of the evidence at the Franks hearing that the affidavit was perjurious, or prepared with ______ reckless disregard for its truth, and (2) whether the affidavit, ___ without the false material, was insufficient to establish probable cause for the search. If so, the warrant was void and the fruits of the search must be suppressed. Franks, 438 U.S. at 155-56. ______ Barnett claims that the heat-imaging data Trooper Welby provided to Lemon, see supra at pp. 5-6, was either deliberately or recklessly ___ _____ false, because Welby failed to inform Lemon that he lacked training and experience in operating the device and failed to examine the device prior to the May 30 flyover to determine which polarity mode was operative. The district court finding that Welby did not act in bad faith was not clearly erroneous. There is no evidence that Welby intention- ally misinterpreted the data from the infrared equipment. Rather, the evidence strongly suggests, just as the court found, that Welby sincerely believed, albeit mistakenly, that the equipment was in the "white-hot" polarity mode during the fly-over. Neither is there evidence that Lemon knew that the heat-imaging data was incorrect. Nevertheless, Barnett argues that Lemon's failure to make note, in the affidavit, that Welby had little experience with the heat-imaging equipment was a material omission made intentionally 22 or with reckless disregard for the truth. Although the district court made no direct finding on this issue, we need not pursue the matter as the affidavit would have been sufficient without the challenged data. "[I]f an affiant knowingly includes a false statement in a warrant affidavit, the warrant will stand if, 'when material that is the subject of the alleged falsity or reckless disre- gard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause.'" United States v. Veillette, 778 F.2d 899, 904 (1st Cir. 1985), cert. _____________ _________ _____ denied, 476 U.S. 1115 (1986) (quoting Franks, 438 U.S. at 171-72). ______ ______ The Fourth Amendment warrant requirement is met if the magistrate had a "'substantial basis for . . . conclud[ing]' that a search would uncover evidence of wrongdoing." Illinois v. Gates, 462 U.S. 213, 236 ________ _____ (1983) (quoting Jones v. United States, 362 U.S. 257, 271 (1960)). _____ ______________ Without regard to the incorrect heat-imaging data, the Lemon affidavit established probable cause to search the trailer.11 The suppression ____________________ 11We summarize some of the more salient information in the affi- davit: (1) In March 1990, a cooperating individual informed Lemon that Barry Jordan and a man known as "Barney" were manufacturing metham- phetamine in the South Shore area, possibly in Scituate. According to the informant, Jordan and "Barney" manufactured ten pounds of metham- phetamine in November or December of 1989. (2) Jordan told DEA undercover agent Kelly that he and his chemist had 160 pounds of chemicals, and needed only hydriodic acid to manufacture forty pounds of methamphetamine. Kelly supplied the hydriodic acid in exchange for Jordan's promise to give Kelly four ounces of methamphetamine. (3) Clandestine methamphetamine labs typically have air vents or ducts to dissipate toxic fumes; photographs of the trailer revealed a "black bordered area" which Lemon, based on his experience, believed 23 ruling was not clearly erroneous. C. Severance C. Severance _________ Next, Barnett claims that denial of his severance motion violated his Sixth Amendment right to confrontation, as a consequence of the prejudice occasioned by the admission in evidence, at the joint trial, of codefendant Fitzgerald's post-arrest statements, see Bruton v. ___ ______ United States, 391 U.S. 123 (1968), and that he was further prejudiced _____________ by the testimony of Fitzgerald's spouse, Sheryl. At trial, Agent Lemon testified as follows: I advised Mr. Fitzgerald that we had done a search on the trailer in his backyard. I advised Mr. Fitzgerald that we had found a speed lab, a methamphetamine lab. I told him that I believed another person was the chemist, and I also told Mr. Fitzgerald that I believed he knew who the other person was and that this other person was a chemist . . . . He told me he knew who this other person was, but that he did not know that this person was involved with a clandestine laboratory. He stated that he knew him or this other person socially and that he would go out on occasion and have a few drinks with this other person. . . . Mr. Fitzgerald told me that he rented the trailer out to this other person and that it was used for construction. . . . Mr. Fitzgerald told me that he . . . did not know what was going on out in the ____________________ to be a trapdoor or venting area for a clandestine laboratory inside the trailer. (4) The pattern of electricity consumption suggested the pres- ence of a clandestine lab. The electricity bills showed a dramatic increase in December 1989, the time period during which Jordan and "Barney" manufactured ten pounds of methamphetamine. (5) During a DEA flyover on May 26, 1990, a DEA agent first observed a power cord running between the trailer and the main house. During a May 28 flyover, two Massachusetts State Troopers observed the same cord. (6) A DEA agent observed Barnett mixing and straining a "yellow, slushy mixture" at the trailer on May 30. (7) The trailer was located in a remote, wooded location, an ideal site for a clandestine laboratory. 24 Barnett objected and moved to strike on Bruton grounds.12 The court ______ trailer, and I then asked Mr. Fitzgerald how he could explain what Mr. Fitzgerald told me was that he was in the trailer, the hydrio[d]ic acid label that was found in his coat, and he saw the bottles of hydrio[d]ic acid, and that he removed one of the labels because he wanted to find out what it was. Lemon's testimony relating his own extrajudicial statements to Fitz- 25 13Although Barnett moved to strike the "entire conversation," he did so on Bruton grounds only. No separate objection was made to ______ given. against Fitzgerald. No limiting instruction was requested, offered or Fitzgerald about "the chemist," no Bruton problem was presented and no ______ the Lemon testimony related the extrajudicial statements Lemon made to _____ There was no confrontation clause violation. First, insofar as 12At sidebar, the following exchange occurred: ____________________ hearsay objection was made.13 Even Fitzgerald's extrajudicial state- ____________ sustained the Barnett objection, but allowed the testimony to stand T H E C O U R T : MR. HORAN:I would still contend that all along [for Barnett]: the statement was sanitized so to speak, but the implication MR. KENDALL:He will. What the Government would [AUSA] is still clear by the Government that the person who is being confessing to anything" and was a mere "fact witness" is reversible anything. He's a fact witness. T H E C O U R T : talked about here is Michael Barnett. Let's assume it is. He [Fitzgerald] is not confessing to nett, or, conversely, it is only to Fitzgerald. Barnett contends that the court's comment that Fitzgerald "was not agree to is the statement will not be admitted against Bar- How is this based under the Bruton issue? ______ error. This argument is baseless. ments to Lemon neither identified nor inculpated Barnett, but merely related factual observations established by other independent evi- dence. Second, assuming the jury did deduce, as seems likely, that Lemon and Fitzgerald were referring to Barnett, Fitzgerald's state- ments nonetheless did not entail the sort of "'powerfully incriminat- ing' effect of one accomplice pointing the finger directly at another, without subjecting himself to cross-examination." United States v. ______________ DiGregorio, 605 F.2d 1184, 1190 (1st Cir.), cert. denied, 444 U.S. 937 __________ ____ ______ (1979), and cert. denied, 444 U.S. 944 (1979), and cert. denied, 444 ____ ______ ____ ______ U.S. 983 (1979) (quoting Bruton, 391 U.S. at 135). See also United ______ ___ ____ ______ States v. Greenleaf, 692 F.2d 182, 188-89 (1st Cir. 1982), cert. ______ _________ ____ denied, 460 U.S. 1069 (1983) (finding no Bruton violation where ______ ______ codefendant's statement was not "powerfully incriminating."). Not only did Fitzgerald not confess guilt, he in no manner admitted to _______ knowledge of Barnett's guilt. Thus, Fitzgerald's admissions to Lemon _________ inculpated neither Barnett nor Fitzgerald.14 ____________________ gerald in the guise of reciting Lemon's investigative efforts. 14Whatever prejudice might otherwise have resulted from the joint trial was minimized by precautions the district court took to forfend against it. After the pretrial severance motion was denied, the government stipulated that any testimony relating post-arrest state- ments by Fitzgerald would not refer to Barnett by name and the dis- trict court firmly admonished against "any mention of [Barnett]" in connection with Fitzgerald's statements. Barnett nevertheless maintains that the court committed revers- ible error by failing to instruct the jury that Fitzgerald's extraju- dicial statements were not admissible against Barnett, even though Barnett did not request a limiting instruction, either at the time of the ruling or at the time of the final jury charge, and even though he did not object to the charge. The claim must be deemed waived, United ______ States v. Mateos-Sanchez, 864 F.2d 232, 238 (1st Cir. 1988); United ______ ______________ ______ 26 Barnett submits that severance was warranted, nonetheless, to avoid the cumulative prejudice from Fitzgerald's extrajudicial state- ments and the testimony of Sheryl Fitzgerald.15 The severance ruling is reviewable for abuse of discretion, reversible only if it "'deprived defendant of a fair trial, resulting in a miscarriage of justice.'" United States v. Tejeda, 974 F.2d 210, 219 (1st Cir. 1992) _____________ ______ (quoting United States v. McLaughlin, 957 F.2d 12, 18 (1st Cir. _____________ __________ 1992)); see also United States v. Martinez, 922 F.2d 914, 922 (1st ___ ____ _____________ ________ Cir. 1991) (severance is committed to the sound discretion of the trial judge, reversible only on a showing of manifest abuse). While incidental prejudice is sometimes unavoidable in a joint trial, only a ____________________ States v. Rawwad, 807 F.2d 294, 296 (1st Cir. 1986), cert. denied, 482 ______ ______ ____ ______ U.S. 909 (1987), especially since it seems highly likely that the trial court would have viewed it as a reasonable tactical decision for defense counsel to refrain from requesting an instruction recalling the jury's attention to Lemon's testimony. "We have been extremely reluctant 'to increase the heavy burdens already imposed on trial judges in criminal cases' by mandating that the district courts act sua sponte to override seemingly plausible strategic choices on the ___ ______ part of counselled defendants." United States v. De La Cruz, 902 F.2d _____________ __________ 121, 124 (1st Cir. 1990) (quoting United States v. Reveron Martinez, _____________ ________________ 836 F.2d 684, 687 (1st Cir. 1988)). Furthermore, we are confident that there was no plain error. The absence of a limiting instruction did not "seriously affect the fundamental fairness and basic integrity of the proceedings," United States v. Griffin, 818 F.2d 97, 100 (1st _____________ _______ Cir.), cert. denied, 484 U.S. 844 (1987). ____ ______ 15Barnett identifies two aspects of Sheryl Fitzgerald's testimony as especially prejudicial: (1) that Barnett entered the Fitzgerald house several times on May 30, leaving with clear plastic sandwich bags in his possession on one occasion; and (2) that, after Barnett left on the evening of May 30, she found a piece of paper bearing handwriting different than her husband's, and gave it to her husband to deliver to Barnett. Barnett does not mention, in this connection, some of Sheryl Fitzgerald's other testimony. For example, she testi- fied that she rented the trailer to Barnett. 27 strong showing of substantial prejudice will warrant reversal. McLaughlin, 957 F.2d at 18. __________ The "heavy burden" of demonstrating the unfair prejudice required for reversal has not been met. See United States v. Perkins, 926 F.2d ___ _____________ _______ 1271, 1280 (1st Cir. 1991). First, the record does not disclose that this issue was preserved at trial, as Barnett neither objected to Sheryl Fitzgerald's testimony, nor requested a limiting or cautionary instruction. Second, Barnett identifies no basis for excluding her testimony, either at a joint trial or a separate trial. Thus, al- though her testimony inculpated Barnett, there was no unfair preju- dice. D. Criminal Rule 35 D. Criminal Rule 35 ________________ Barnett appeals from the dismissal of his motion to correct sentence pursuant to Fed. R. Crim. P. 35(a), which sought a downward departure due to diminished mental capacity.16 The district court ____________________ 16Barnett claims that he suffers from short-term memory loss. Mental and emotional conditions generally are not grounds for downward departure. U.S.S.G. 5H1.3. See United States v. Lauzon, 938 F.2d ___ _____________ ______ 326, 333 (1st Cir.), cert. denied, ___ U.S. ___, 112 U.S. 450 (1991); ____ ______ United States v. Studley, 907 F.2d 254, 257 (1st Cir. 1990). Never- _____________ _______ theless, a guideline policy statement provides as follows: If the defendant committed a non-violent offense while suf- fering from significantly reduced mental capacity not result- ing from voluntary use of drugs or other intoxicants, a lower sentence may be warranted to reflect the extent to which reduced mental capacity contributed to the commission of the offense, provided that the defendant's criminal history does not indicate a need for incarceration to protect the public. U.S.S.G. 5K2.13. 28 dismissed on the ground that it lacked the power to grant relief under Rule 35(a). Rule 35(a)17 expressly empowers a district court to correct a sentence only on remand from the court of appeals. United States v. _____________ Carr, 932 F.2d 67, 69 (1st Cir.), cert. denied, ___ U.S. ___, 112 S. ____ ____ ______ Ct. 112 (1991). Rule 35(c), which permits the sentencing court to correct a sentence imposed as a result of arithmetical, technical, or other clear error, was not in effect either when the Barnett motion was filed or dismissed. Moreover, in this case we need not consider whether the district court had the inherent power to correct obvious _______ sentencing errors, see United States v. Rico, 902 F.2d 1065, 1067-68 __________ ______ ___ ______________ ____ (2d Cir.), cert. denied, ___ U.S. ___, 111 S. Ct. 352 (1990); United _____ ______ ______ States v. Cook, 890 F.2d 672, 674-75 (4th Cir. 1989); see also Carr, ______ ____ ___ ____ ____ 932 F.2d at 70-71, since there were none. As the sentence imposed on Barnett was in no respect unlawful or unreasonable, the motion to reconsider was properly dismissed. ____________________ 17Federal Rule of Criminal Procedure 35(a) provides: The court shall correct a sentence that is determined on __ appeal under 18 U.S.C. 3742 to have been imposed in violation ______ of law, to have been imposed as a result of an incorrect application of the sentencing guidelines, or to be un- reasonable, upon remand of the case to the court ____ ______ (1) for imposition of a sentence in accord with the findings of the court of appeals; or (2) for further sentencing proceedings if, after such pro- ceedings, the court determines that the original sentence was incorrect. Fed. R. Crim. P. 35(a) (emphasis added). 29 E. Outrageous Government Conduct E. Outrageous Government Conduct _____________________________ Barnett claims that the indictment should have been dismissed on due process grounds, since Agent Kelly's sale of hydriodic acid to Jordan constituted outrageous government conduct. Law enforcement conduct violates the Due Process Clause of the Fifth Amendment if it results in a denial of "'fundamental fairness, shocking to the univer- sal sense of justice.'" United States v. Russell, 411 U.S. 423, 432 _____________ _______ (1973) (quoting Kinsella v. United States ex rel. Singleton, 361 U.S. ________ _______________________________ 234, 246 (1960)). See also United States v. Panitz, 907 F.2d 1267, ___ ____ _____________ ______ 1272 (1st Cir. 1990) ("The Supreme Court has not foreclosed the pos- sibility that the government's active participation in a criminal venture may be of so shocking a nature as to violate a defendant's right to due process, notwithstanding the defendant's predisposition to commit the crime"). We find no due process violation. Because drug conspiracies are notoriously difficult to penetrate, courts consistently have allowed greater government involvement in drug-crime investigations. Panitz, 907 F.2d at 1273. Law enforcement ______ infiltration of drug rings, and even limited investigative participa- tion in their unlawful operations, do not constitute outrageous government conduct violative of due process. Russell, 411 U.S. at _______ 432. Although Agent Kelly sold Jordan a precursor chemical which is an integral methamphetamine component, the government was neither the conspirators' sole source (hydriodic acid obtained from other sources was seized in the warehouse search), nor did the government initiate 30 the criminal conduct. Jordan told Agent Kelly that Barnett had been producing methamphetamine for ten years. Other evidence revealed that Jordan and Barnett had manufactured eight to ten pounds of metham- phetamine in 1989. The sale of hydriodic acid to Jordan in these circumstances was a permissible investigative effort to infiltrate the suspected drug-related conspiracy. The district court properly denied the motion to dismiss on due process grounds. F. Cumulative Error F. Cumulative Error ________________ Finally, as most assignments of error were baseless, we reject Barnett's contention that the cumulative effect of the many errors he alleges required reversal on due process grounds. We are well satis- fied that Barnett received due process: "[T]he Constitution entitles a criminal defendant to a fair trial, not a perfect one." Delaware v. ________ Van Arsdall, 475 U.S. 673, 681 (1986). ___________ The sentence of appellant Jordan and the conviction and sentence __________________________________________________________________ of appellant Barnett are affirmed. _________________________________ 31