**UNITED STATES of America, Appellee,**

v.

**James W. McCOY, Defendant, Appellant.**

**No. 91–2251.**

United States Court of Appeals,
First Circuit.

Heard July 31, 1992.

Decided Oct. 19, 1992.

---

Glenn G. Geiger, Jr. with whom Geiger & Heiser, P.C., Penacook, N.H., was on brief, for defendant, appellant.

Michael J. Connolly, Asst. U.S. Atty., with whom Jeffrey R. Howard, U.S. Atty., Concord, N.H., was on brief, for appellee.

Before TORRUELLA, CYR and BOUDIN, Circuit Judges.

CYR, Circuit Judge.

After defendant James W. McCoy was indicted on four counts of violating 18 U.S.C. § 922(g)(1), which makes it unlawful

for a convicted felon to possess a firearm, he filed three motions to dismiss the indictment and two motions to suppress evidence of the firearms. The motions were denied and McCoy was tried and convicted on all counts. He challenges only the district court orders denying the pretrial motions. We affirm.

## I

## BACKGROUND

Between July 21 and August 14, 1987, the town of Hampton Falls, New Hampshire was beset by a series of burglaries which seemed linked by several similarities. Each occurred during working hours on a weekday. In each instance, entry was gained by prying open a door, or if an attempted entrance through a door proved unsuccessful, by prying open a window. Typically, jewelry, cash, tools, and other small personal items were carried away in pillow cases and nylon bags.

### A. *Allen Burglary*

On August 14, 1987, the Hampton Falls home of John Allen was burglarized. At approximately 1:30 p.m., George Allen, John Allen's brother and neighbor, spotted an unfamiliar black Dodge van parked near John Allen's home. He stopped to investigate, and noticed a white male walking away from the back of his brother's house. He asked the stranger what he was doing, and the man, who appeared nervous, replied, "just surveying." The man then shouted toward the tree line at the back of the property, as if to another person, words to the effect that he would finish the job later. The man then got into the van, and George Allen remarked to him that if he was simply surveying, he would not object to his license plate number being recorded. George Allen recorded the number, and the man drove away in the black van.

When John Allen returned home that evening, he discovered that his house had been forcibly entered through a rear cellar window and an unsuccessful attempt had been made to pry a rear door. Although it appeared that nothing had been taken from the house, a nylon bag packed with jewelry and other personal items was found in the master bedroom. Hampton Falls Deputy Police Chief Dean R. Glover was dispatched to investigate the burglary. George Allen told Glover that the man he had seen that afternoon was a white male with dark curly hair, between five feet ten inches and five feet eleven inches tall, and between one hundred and seventy and two hundred pounds. Allen initially estimated the man's age at between twenty-five and thirty years, but moments later revised his estimate to thirty-five years or older.

### B. *Arrest Warrant*

Deputy Chief Glover ran a check on the license plate number provided by George Allen and discovered that the van was registered to appellant James W. McCoy at an address in neighboring Hampton, New Hampshire. Glover then ran a license check, which revealed that McCoy was forty years old, five feet eleven inches tall, two hundred pounds, with brown hair and eyes. Armed with this information, Glover prepared an affidavit and complaint for an arrest warrant charging McCoy with burglary. The supporting affidavit described the burglary of the John Allen residence and George Allen's encounter with "a white male individual, heavyset, approx. 5'10±", dark medium-length hair, blue shirt and dark pants." The affidavit included other descriptive information obtained through the motor vehicle registration and license check: "Hgt 5'11", wgt 200 lbs." The complaint and supporting affidavit were submitted to a Justice of the Peace, who issued the arrest warrant.

### C. *Subsequent Events*

Deputy Chief Glover contacted the Hampton police and arranged to have two Hampton police officers, detectives Lalley and Wardle, accompany him to McCoy's residence in Hampton. Neither McCoy nor the van was at the address, but the landlord informed the officers that McCoy had loaded his personal belongings into the van early that afternoon and was not expected to return. The landlord mentioned that he

had seen some items in McCoy's apartment that struck him as unusual possessions for a construction worker, among them an antique clock bearing a Latin inscription and the word "Florida" on its face. Glover suspected that the clock the landlord described and a one-of-a-kind antique Belgian clock (bearing the inscription "Tempus Fugit" and the word "Florida") stolen in a July 24, 1987 burglary of another Hampton Falls residence, were one and the same. Detectives Wardle and Lalley of the Hampton Police Department were present during the discussion of the clock. The landlord permitted the officers to inspect McCoy's apartment; two television sets were found, as well as several pieces of jewelry and a few coins.

During the following week, the landlord turned over some of McCoy's mail to Deputy Chief Glover, who noted that two envelopes bore the return address of the First National Bank of Portsmouth. Glover learned that McCoy still had an active account at the Hampton branch of the bank. Bank personnel informed the police that McCoy occasionally brought large quantities of coins to the bank. Glover requested that bank personnel notify either the Hampton Police Department or the Hampton Falls Police Department in the event McCoy made any further contact with the bank.

Bank personnel directed Glover to McCoy's employers, Earl and Dean Verity, who owned a construction company and were in the process of building a house very near the scene of another Hampton Falls burglary under investigation by Glover. Glover learned that McCoy had been employed by the company, but had left work suddenly around noon on the day of the Allen burglary, and never returned. The Veritys informed Glover that McCoy had given them some outdoor lawn tools, which Glover noted were similar to the tools stolen in yet another recent Hampton Falls burglary.

Within a week after the Allen burglary, Glover learned that McCoy had an extensive criminal record, including convictions for breaking and entering, receiving stolen property, and burglary, and that there was a warrant outstanding in another state for his arrest on burglary charges.

D. *Arrest*

At 8:55 a.m. on August 21, 1987, McCoy appeared at the drive-up window of the Hampton branch of the First National Bank of Portsmouth. He was recognized by the teller, who requested that he come into the bank to resolve a problem with his account. The Hampton Police Department was notified, and ten police officers were dispatched to the bank.[1] The Hampton police arrested McCoy as he emerged from the bank and headed toward the van. Among the Hampton police officers at the scene was Detective Wardle, who had accompanied Glover to the defendant's residence on the evening of the Allen burglary.

E. *Impoundment and Search of Van*

After McCoy was arrested, the van was towed to the Hampton Police Department for an inventory search, but then it was decided to await the issuance of a search warrant.[2]

Glover filed a search warrant application with the Hampton District Court, supported by the affidavit submitted with the arrest warrant application, four Hampton Falls Police Department burglary reports, and a photograph of the antique Belgian

---

1. The arrest procedures to be used in the event McCoy appeared at the bank had been prearranged by the Hampton Falls Police Department and the Hampton Police Department. As agreed, the Hampton Police Department responded as it would to a bank robbery alarm.

2. Within two hours after McCoy's arrest, Glover was informed by the arresting officers that the license plate number on the van matched the number given to Glover by George Allen, and that it looked as if a paint roller had been used hurriedly to paint the van a maroon color. Black paint was still visible around the door locks and mirrors. The arresting officers further informed Glover that several items, including a clock, power tools, and a number of nylon bags filled with "stuff," were visible through the windows of the van. Detective Wardle advised Glover that he believed that the clock seen in the van was the one described by McCoy's landlord.

clock. The warrant issued, but before beginning the search Glover looked in the windows at the contents of the van.[3] Glover and a Hampton police sergeant proceeded to search the van. Sixty-one items were inventoried, including the four firearms which form the basis for the federal charges in the present case.

On September 26, 1988, McCoy pled guilty in Rockingham County Superior Court to seven felony counts of receiving stolen property. During 1991, he was indicted, tried and convicted on four federal firearms charges under 18 U.S.C. § 922(g)(1). We turn to the claims presented on appeal.

## II

## DISCUSSION

A. *Motions to Suppress*

1. "Automobile Exception"

Appellant claims that the evidence seized from the van should have been suppressed because the search warrant obtained by Deputy Chief Glover was not supported by probable cause. Assuming, without deciding, the search warrant was invalid, we nonetheless conclude that the district court properly denied the motions to suppress, as the search was permissible under the "automobile exception" to the Fourth Amendment warrant requirement.

■ Under the "automobile exception," the only essential predicate for a valid warrantless search of a motor vehicle by law enforcement officers is "probable cause to believe that the [vehicle] contains contraband or other evidence of criminal activity." *United States v. Panitz*, 907 F.2d 1267, 1271 (1st Cir.1990). *See Carroll*

v. *United States*, 267 U.S. 132, 153–56, 45 S.Ct. 280, 285–86, 69 L.Ed. 543 (1925). "The inherent mobility of motor vehicles, *California v. Carney*, 471 U.S. 386, 390, 105 S.Ct. 2066, 2068, 85 L.Ed.2d 406 (1985), and the reduced expectation of privacy associated with them, *id.* at 391, 105 S.Ct. at 2069, [ ] justify application of the vehicular exception '[e]ven in cases where an automobile [is] not immediately mobile.' " *Panitz*, 907 F.2d at 1271. We have held that probable cause alone justifies a warrantless search of a motor vehicle seized without a warrant while parked in a public place, "whether or not exigent circumstances prevailed at either the time of the seizure or the time of the search. Moreover, the search, so long as reasonable in scope, need not be conducted contemporaneously with the seizure...." *Id.* at 1272 (citing cases). Provided there was probable cause to believe that an offense had been committed and that a search would turn up evidence of the offense, *see United States v. Aguirre*, 839 F.2d 854, 857–58 (1st Cir. 1988), the seizure and search of the van were lawful under the "automobile exception" without regard to the validity of the search warrant.[4]

■ At the time of the arrest, Glover knew that McCoy and the van had been observed in highly suspicious circumstances at the scene of the Allen burglary. Glover and Detective Wardle had learned from McCoy's landlord that McCoy possessed a clock similar to one stolen in another nearby burglary, and that he had left hurriedly in the van with his belongings. Over the ensuing week, Glover collected considerable circumstantial evidence from various sources linking McCoy with several other Hampton Falls burglaries.[5] Thus, by

---

**3.** Glover observed a large quantity of tools, a "dozen or so" canvas and nylon tote bags with what appeared to be jewelry spilling out of them, bags of tools, pry bars and hammers, lounge chairs, some clothes, and, most notably, a clock—matching the description of the stolen Belgian clock—and a leaf blower—matching the description of one stolen in another of the Hampton Falls burglaries.

**4.** Provided there was probable cause to search the van at the time of McCoy's arrest, the search

was valid even if the arrest was not, as the police would have had an independent basis for searching the van, apart from any exploitation of illegal conduct. *See Brown v. Illinois*, 422 U.S. 590, 599, 95 S.Ct. 2254, 2259, 45 L.Ed.2d 416 (1975); *United States v. Pimental*, 645 F.2d 85, 86 (1st Cir.1981).

**5.** The evidence established that the Hampton and Hampton Falls police conducted a cooperative investigation. Detective Wardle of the Hampton Police Department accompanied Glo-

the time of the arrest there was probable cause to believe that burglaries had been committed and that McCoy was in possession of at least some of the stolen property. Glover and Wardle arguably had probable cause to believe that stolen property would be found in the van upon learning from the landlord that McCoy had loaded his possessions in the van on the afternoon of the Allen burglary and appeared to have abandoned his apartment. Assuming that the police had probable cause to believe that a search of the van would turn up evidence of the burglaries, their seizure of the van at the bank parking lot was lawful. Any doubt as to the legality of the search is removed given that prior to commencing the search, some five hours later, *see United States v. Moscatiello*, 771 F.2d 589, 595, 600 (1st Cir.1985) (eighteen hours between seizure and search); *United States v. McHugh*, 769 F.2d 860, 865–67 (1st Cir. 1985) (one week), the police looked through the windows of the van and saw an antique clock, closely resembling the stolen Belgian clock, and a leaf blower, closely resembling one stolen in another local burglary. At that point, there can be no question that the police had probable cause to believe the van contained evidence of criminal activity. As the van was lawfully searched, the district court correctly denied the motions to suppress.

## B. *Motions to Dismiss*

### 1. Pre-indictment Delay

Appellant claims that the passage of three and one-half years between the seizure of the firearms and the return of the federal indictment violated his Fifth Amendment right to due process and his Sixth Amendment right to speedy trial.

#### a. *Due Process*

■ Pre-indictment delay violates due process if "(1) [it] caused substantial prejudice to [the defendant's] right to a fair trial *and*, (2) the Government intentionally delayed indictment in order to gain a tactical advantage over the accused." *United States v. Picciandra*, 788 F.2d 39, 42 (1st Cir.) (citing *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971)) (emphasis added), *cert. denied*, 479 U.S. 847, 107 S.Ct. 166, 93 L.Ed.2d 104 (1986). *See also United States v. Acevedo*, 842 F.2d 502, 504 (1st Cir.1988). For the defendant to carry the heavy burden of proving actual prejudice from pre-indictment delay, concrete proof is required; mere speculation and bare allegations will not suffice. *Acha v. United States*, 910 F.2d 28, 32 (1st Cir.1990).

■ Although appellant claims that he was prejudiced by the extended pre-indictment delay, in that his decision to plead guilty to the state felony charges was predicated on a "belief" that federal charges would not be filed, he neither alleges nor demonstrates that any agent of the federal government ever represented that he would not be prosecuted for the federal firearms violations. The further argument that the delay diminished the opportunity to serve concurrent time on the state and federal offenses is based on the speculation that either sentence would be made to run concurrently. Moreover, even if the claims of prejudice were sustainable, appellant has not shown that the government intentionally delayed indictment to gain a tactical advantage. *See Picciandra*, 788 F.2d at 42.

#### b. *Sixth Amendment*

■ Appellant contends that the extended pre-indictment delay violated "the very

---

ver to McCoy's residence on the evening of the Allen burglary. Wardle participated in the discussion with McCoy's landlord regarding the antique Belgian clock seen in McCoy's apartment. The two police departments communicated "at length" during the week preceding the arrest, and jointly established a procedure for the arrest. Glover learned of McCoy's criminal record, including the burglary and stolen prop-

erty charges, and communicated a warning to the Hampton police to exercise caution in approaching the defendant. "Where law enforcement authorities are cooperating in an investigation, ... the knowledge of one is presumed shared by all." *Illinois v. Andreas*, 463 U.S. 765, 771 n. 5, 103 S.Ct. 3319, 3324 n. 5, 77 L.Ed.2d 1003 (1983).

spirit" of the Sixth Amendment and the Speedy Trial Act, 18 U.S.C. § 3161. As appellant concedes, however, no Sixth Amendment right to speedy trial arises prior to the filing of the criminal charge. *United States v. MacDonald*, 456 U.S. 1, 7, 102 S.Ct. 1497, 1501, 71 L.Ed.2d 696 (1982). *See United States v. Marler*, 756 F.2d 206, 211 (1st Cir.1985) (Sixth Amendment speedy trial right arises at filing of federal indictment).[6]

### 2. Petite Policy

■ Appellant contends that the federal indictment contravened the Justice Department's so-called *Petite* policy, thereby violating his due process rights. The *Petite* policy, *see Petite v. United States*, 361 U.S. 529, 80 S.Ct. 450, 4 L.Ed.2d 490 (1960) (per curiam), is an internal Justice Department policy forbidding federal prosecution of a person for alleged criminality which was "an ingredient of a previous state prosecution against that person;" exceptions are made only if the prosecution will serve "compelling interests of federal law enforcement." *Thompson v. United States*, 444 U.S. 248, 248, 100 S.Ct. 512, 512, 62 L.Ed.2d 457 (1979). It is a federal prosecutorial policy, not a matter of constitutional law. *United States v. Booth*, 673 F.2d 27, 30 (1st Cir.), *cert. denied*, 456 U.S. 978, 102 S.Ct. 2245, 72 L.Ed.2d 853 (1982). *See Rinaldi v. United States*, 434 U.S. 22, 29, 98 S.Ct. 81, 85, 54 L.Ed.2d 207 (1977) (*Petite* policy "not constitutionally mandated"). As we have explained,

> [t]he *Petite* policy and cases construing it stand only for the proposition that the government's motion to dismiss should be granted when it discovers that it is conducting separate prosecutions for the

same offense. The doctrine does not create a corresponding right in the accused. *Booth*, 673 F.2d at 30.

Appellant argues that *Booth* is not controlling as the Justice Department revised the policy after *Booth* was decided. Those courts of appeals which have examined the *Petite* policy since its revision in 1988, however, have adhered to the view that it does not confer substantive rights on an accused. *See, e.g., United States v. Simpkins*, 953 F.2d 443, 444–45 (8th Cir.) (*Petite* policy does not confer substantive rights on criminal defendant, thus cannot form the basis of claim that subsequent prosecution was improper), *cert. denied*, —— U.S. ——, 112 S.Ct. 1988, 118 L.Ed.2d 585 (1992); *United States v. Rodriguez*, 948 F.2d 914, 915 (5th Cir.1991) (as an internal rule of Justice Department, policy may not be invoked by defendant to bar prosecution), *cert. denied*, —— U.S. ——, 112 S.Ct. 2970, 119 L.Ed.2d 590 (1992); *United States v. Pungitore*, 910 F.2d 1084, 1120 (3d Cir. 1990) (policy does not confer substantive rights on defendants); *United States v. Heidecke*, 900 F.2d 1155, 1157 n. 2 (7th Cir.1990) (as internal guideline, policy gives defendant no substantive rights). We hold that neither the *Petite* policy nor its 1988 revision conferred substantive rights on the defendant.

*The district court judgment is affirmed.*

---

**6.** Appellant argues that the district court should have dismissed the indictment for lack of prosecution, pursuant to Federal Rule of Criminal Procedure 48(b), which provides:

> If there is unnecessary delay in presenting the charge to a grand jury or in filing an information against a defendant who has been *held to answer to the district court*, or if there is unnecessary delay in bringing a defendant to

trial, the court may dismiss the indictment, information or complaint.

Fed.R.Crim.P. 48(b) (emphasis added). Rule 48(b) is limited in application to post-arrest delay. *United States v. Marion*, 404 U.S. 307, 319, 92 S.Ct. 455, 462, 30 L.Ed.2d 468 (1971). Appellant does not complain of unnecessary delay following the federal indictment.