**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                        No. 96-4770

ANTONIO ALVAREZ SOBRAL, JR.,
Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
James C. Cacheris, Senior District Judge.
(CR-96-89-A)

Argued: April 10, 1998

Decided: May 29, 1998

Before LUTTIG and WILLIAMS, Circuit Judges, and
BUTZNER, Senior Circuit Judge.

_____

Affirmed in part, vacated in part, and remanded by unpublished per
curiam opinion.

_____

**COUNSEL**

**ARGUED:** Brian William Shaughnessy, SHAUGHNESSY,
BOROWSKI & GAGNER, Washington, D.C., for Appellant. Daniel
Locke Bell, II, Assistant United States Attorney, OFFICE OF THE
UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.
**ON BRIEF:** Helen F. Fahey, United States Attorney, OFFICE OF
THE UNITED STATES ATTORNEY, Alexandria, Virginia, for
Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

A jury convicted Antonio Sobral of four counts of mail fraud, see 18 U.S.C.A. § 1341 (West Supp. 1998); and one count of engaging in a monetary transaction in criminally derived property, see 18 U.S.C.A. § 1957 (West Supp. 1998). As a result of these convictions, Sobral was sentenced to 44 months imprisonment. Sobral appeals both his convictions and his sentence. We affirm the convictions but vacate the sentence and remand for resentencing.

I.

Between 1987 and 1993, Sobral, a licensed securities broker and lawyer, received more than $300,000 from eight individuals. In 1993, several of the individuals complained to the Virginia State Corporation Commission (VSCC) that they had been swindled by Sobral. At the same time, an unrelated criminal investigation into Sobral's financial dealings was launched by the Prince William County Police Department.

On June 16, 1994, Sobral pleaded guilty in Prince William Circuit Court to "wrongfully and fraudulently, with the intent to permanently deprive, use, embezzle, dispose of or conceal money or property . . . belonging to Joseph Lyon, Jr., which money or property he had by virtue of his office, trust, or employment." (J.A. at 24.) Four days later, Sobral entered into a settlement with the VSCC in which he admitted that he had knowingly defrauded five of his clients. In particular, Sobral stipulated that he had "misrepresent[ed] that funds provided by [victims] would be used for investment purposes." (J.A. at 188.) As a part of the settlement, Sobral agreed to make restitution to the five victims of more than $314,000. In the fall of 1995, Sobral stopped making the required payments.

2

On March 14, 1996, a federal grand jury returned a six-count indictment against Sobral. The indictment alleged four counts of mail fraud, see 18 U.S.C.A. § 1341 (West Supp. 1998); one count of interstate transportation of money taken by fraud, see 18 U.S.C.A. § 2314 (West Supp. 198); and one count of engaging in a monetary transaction in criminally derived property (money-laundering), see 18 U.S.C.A. § 1957 (West Supp. 1998).[1]

Prior to trial, Sobral moved to dismiss the indictment on the grounds that it violated the Department of Justice's dual prosecution policy and his Fifth Amendment right to Due Process. On May 3, 1996, the district court denied Sobral's motion. On May 21, 1996, Sobral issued subpoenas duces tecum to Bing Wu, Sheue Su, George Tsui, Eddie Tsui, and the Peking Gourmet, requesting certain financial records. The witnesses/victims filed motions to quash or modify the subpoenas, which the Government joined. At a hearing on the motions to quash, the Government argued that the subpoenas were overly broad, unreasonable, unjustified, and oppressive. The district court agreed and quashed the subpoenas.

On June 10, 1996, Sobral's trial began. At trial, it was undisputed that Sobral used the money he received for personal purposes. Sobral contended, however, that the individuals in question loaned him the money. As a result, he argued that he could spend the money as he saw fit. In contrast, the Government introduced evidence that the funds provided to Sobral were not loans but investments that Sobral had a fiduciary duty to invest in fixed securities. At the close of evidence, Sobral moved pursuant to Rule 29 of the Federal Rules of Criminal Procedure for judgment of acquittal, which the district court denied. On June 14, 1996, Sobral was convicted by a jury on all four counts of mail fraud and the one count of money-laundering. The jury acquitted Sobral on the count charging interstate transportation of money taken by fraud. The district court sentenced Sobral to 44 months imprisonment.

_____

[1] The district court dismissed the single money-laundering count because it was improperly pleaded. On May 9, 1996, the grand jury returned a superseding indictment that corrected the defect in the money-laundering count.

On appeal, Sobral contends that the district court erroneously (1) quashed the subpoenas duces tecum, (2) denied his Rule 29 motion for judgment of acquittal, (3) failed to dismiss the indictment, and (4) applied the Sentencing Guidelines. We address Sobral's arguments in turn.

II.

First, Sobral contends that the district court erred in quashing the subpoenas duces tecum that he served on certain Government witnesses. Rule 17(c) of the Federal Rules of Criminal Procedure governs the issuance of subpoenas duces tecum in federal criminal proceedings. In so doing, Rule 17(c) "implements the Sixth Amendment guarantee that an accused have compulsory process to secure evidence in his favor." In re Martin Marietta Corp., 856 F.2d 619, 621 (4th Cir. 1988). Rule 17(c) provides, in pertinent part: "The [district] court on motion made promptly may quash or modify the subpoena if compliance would be unreasonable or oppressive." Fed. R. Crim. P. 17(c). The Supreme Court has determined that to be reasonable,

> the moving party must show: (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production . . . ; and (4) that the application is made in good faith and is not intended as a general "fishing expedition."

United States v. Nixon, 418 U.S. 683, 699-700 (1974) (footnote omitted). For the reasons that follow, we conclude that Sobral has simply failed to satisfy the standards established in Nixon.

First, Sobral has not adequately explained the relevancy of the requested records. The subpoenas made sweeping requests for bank, credit, tax, and other financial records. According to Sobral, he sought these records to expose (1) the relationship of the alleged victims and (2) the source of the funds allegedly invested with him by Tsui. Without a more specific proffer, we fail to see the relevancy of the requested records to any of the Six Counts in the indictment.

4

Second, Sobral had already received all of the information on the victims in the Government's possession. In addition, Sobral's counsel admitted during the hearing on the motions to quash that he did not need all of the subpoenaed records. Even more telling, Sobral's counsel conceded that, with the exception of Tsui, he did not know what the records would reveal. As such, the subpoenas amounted to nothing more than a fishing expedition. As to Tsui, the district court permitted Sobral the defense to subpoena his tax records. For reasons that are not entirely clear, however, Sobral failed to do so.

III.

Next, Sobral contends that there was insufficient evidence for the jury to find that he committed mail fraud. Instead, Sobral argues that the evidence established that the financial transactions in question were loans and, as a result, he could use the money as he saw fit. When assessing the sufficiency of the evidence of a criminal conviction on direct review, "[t]he verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." Glasser v. United States, 315 U.S. 60, 80 (1942). We believe, for the reasons that follow, that there was sufficient evidence supporting the jury's verdict.

First, the Government introduced Sobral's admission (made during his settlement of the civil case) that he had made false representations to investors.[2] Second, the Government introduced Sobral's guilty plea to embezzling funds from one of the victims.[3] Third, six of Sobral's

_____

[2] On June 20, 1994, Sobral entered into a settlement with the VSCC in which he admitted that he had knowingly defrauded five of his clients. In particular, Sobral stipulated that he had "misrepresent[ed] that funds provided by [victims] would be used for investment purposes." (J.A. at 188.) As a part of the settlement, Sobral agreed to make restitution to the five victims of more than $314,000, but he stopped making the required payments in the fall of 1995.

[3] On June 16, 1994, Sobral pleaded guilty in Prince William Circuit Court to "wrongfully and fraudulently, with the intent to permanently deprive, use, embezzle, dispose of or conceal money or property . . . belonging to Joseph Lyon, Jr., which money or property he had by virtue of his office, trust, or employment." (J.A. at 24, 28.) Although Sobral's plea did not involve any of the other victims of his scheme, he "admitted to essentially doing what he is charged with here." (J.A. at 175.)

victims testified that Sobral presented himself as an expert in financial affairs and solicited them for money to invest, not borrow.[4] Fourth, Sobral regularly mailed each victim a letter on his corporate letterhead updating them on the status of their "trust accounts."[5] Given the overwhelming evidence of guilt, including Sobral's guilty plea to similar charges in state court and his stipulation in the civil proceeding, the district court properly denied Sobral's Rule 29 motion for judgment of acquittal.

_____

[4] The following testimony of Kathy Wu is consistent with the other victims who testified:

> Q. You used the word investment. Who used the word at that meeting?
>
> A. Antonio Sobral.
>
> Q. And how much money did your parents decide to invest at that meeting?
>
> A. [$]22,000, around $22,000.
>
> Q. Now, what did Mr. Sobral say about how he would invest that money?
>
> A. He didn't say. He said don't worry about what kind of investment because he is a professional, he knew how to do investment, but he guaranteed 18 percent interest rate.
>
> Q. Now, did he make any mention at all of using that money to pay his own debts or to use it for his own personal purposes?
>
> A. Never.
>
> Q. Was the word "loan" or the idea of a loan ever mentioned at that meeting?
>
> A. Never.

(S.A. at 187.)

[5] For example, Sobral sent Mrs. Su a letter stating, in part, that he had deposited her $50,000 in a "trust account." In reality, Sobral deposited the $50,000 into his personal bank account. Sobral used the $50,000 to cover a $46,000 personal check that he wrote to his brother in California to repay a personal loan.

6

IV.

Sobral also contends that the three year delay in bringing the indictment violated his Fifth Amendment right to Due Process and the Government's own policy against dual prosecutions. **6** As a result, Sobral argues that the district court erred in failing to dismiss the indictment. For the reasons that follow, we disagree.

A.

"[A] defendant may invoke due process to challenge delay both before and after official accusation." See Doggett v. United States, 505 U.S. 647, 655 n.2 (1992). "[I]n order to establish a due process violation, the defendant must show that the delay`caused him actual prejudice in presenting his defense.'" Jones v. Angelone, 94 F.3d 900, 906 (4th Cir. 1996) (quoting United States v. Gouveia, 467 U.S. 180, 192 (1984)). Here, the district court found that Sobral's right to due process had not been violated because his defense was not impaired by the delay. We agree.

On appeal, Sobral has not identified any witness that was unavailable as a result of the delay. Nor has he alleged that any witness was unable accurately to recall the events in question. Although Sobral contends that certain documents were unavailable because of the delay, he does not say what those records consisted of or how they would have assisted the defense. Because Sobral does not contend that any exculpatory evidence was lost, we cannot say that the district court was clearly erroneous in finding that his defense was not impaired by the delay. See United States v. Burns, 990 F.2d 1426, 1435 (4th Cir. 1993).

B.

Sobral's claim that the federal indictment violates the Justice Department's policy against dual prosecutions is also without merit. That internal policy states as follows:

_____

**6** Sobral does not contend that the delay violated his Sixth Amendment right to a speedy trial.

7

The Department of Justice's dual prosecution policy precludes the initiation or continuation of a federal prosecution following a state prosecution based on substantially the same act or acts unless there is a compelling federal interest supporting the dual prosecution. The policy is intended to regulate prosecutorial discretion in order to promote efficient utilization of the Department's resources and to protect persons charged with criminal conduct from the unfairness associated with multiple prosecutions and multiple punishments for substantially the same act or acts.

United States Attorney's Manual, § 9-2, 142 (1990). It is well established that the policy is not constitutionally mandated. See, e.g., Rinaldi v. United States, 434 U.S. 22, 29 (1977); United States v. Booth, 673 F.2d 27, 30 (1st Cir. 1982). Moreover, the policy does not confer any substantive rights on a criminal defendant. See, e.g., United States v. Simpkins, 953 F.2d 443, 444-45 (8th Cir. 1992); United States v. Rodriguez, 948 F.2d 914, 915 (5th Cir. 1991); United States v. Pungitore, 910 F.2d 1084, 1120 (3d Cir. 1990); United States v. Heidecke, 900 F.2d 1155, 1157 n.2 (7th Cir. 1990). Thus, the "dual prosecution" policy simply cannot be invoked by a criminal defendant to bar prosecution. See, e.g., United States v. McCoy, 977 F.2d 706, 712 (1st Cir. 1992).

V.

Finally, Sobral appeals his sentence. Specifically, Sobral contends that the district court (1) miscalculated the funds he laundered under § 2S1.1, (2) erred in concluding that he obstructed justice under § 3C1.1, (3) erred in finding that he held a position of trust under § 3B1.3, and (4) miscalculated the loss to the victims under § 2F1.1. To give due deference to a district court's application of the Sentencing Guidelines, we review factual determinations for clear error and legal questions de novo. See United States v. Blake, 81 F.3d 498, 503 (4th Cir. 1996). Moreover, at sentencing, a district court need support its findings of fact only by a preponderance of the evidence. See United States v. Morgan, 942 F.2d 243, 246 (4th Cir. 1991).

A.

Initially, Sobral contends that the district court erroneously calculated the value of the funds he laundered, which, in turn, resulted in

8

an unwarranted increase in his offense level. Sobral was convicted of violating 18 U.S.C.A. § 1957 (monetary transaction in criminally deprived property). The Sentencing Guidelines provide a base offense level of 17 for this offense. See U.S. Sentencing Guidelines Manual § 2S1.2(a) (1995). However, if the value of the laundered funds exceeds $100,000, the Sentencing Guidelines incrementally increase the base offense level according to the amount of money laundered. See U.S.S.G. § 2S1.1(b)(2)(A)-(N). Finding that Sobral was responsible for laundering more than $100,000, the district court increased his base offense level by one point. See U.S.S.G. § 2S1.1(b)(2)(A).

On appeal, Sobral contends that the district court erred by including financial transactions under $10,000 when it calculated the amount of money laundered.[7] Specifically, Sobral points out that transactions under $10,000 do not violate 18 U.S.C.A. § 1957. As a result, Sobral argues that amounts under $10,000 should not have been included when the district court determined the value of the funds laundered.

This issue turns on the meaning of the phrase "the value of the funds." U.S.S.G. § 2S1.1(b)(2). In context, we believe that "funds" refers to "laundered funds." As a result, only the value of the laundered funds should have been counted. The Government argues that the district court properly concluded that the funds associated with uncharged instances of money laundering were relevant conduct under § 1B1.3. We agree that uncharged instances of money laundering would constitute relevant conduct. See, e.g. , United States v. Johnson, 971 F.2d 562, 575-76 & n.10 (10th Cir. 1992) (so holding). The problem here, however, is that the transactions in question did not constitute money laundering -- perhaps explaining why they were uncharged. Accordingly, the district court erred in increasing the offense level by one point.

_____

[7] There were only three transactions greater than $10,000. Combined, these three transactions total $94,107.62. Thus, if the additional transactions are not included, the one level increase was erroneous. See U.S.S.G. § 2S1.1(b)(2)(A) (no increase for transaction under $100,000).

9

B.

Next, Sobral contends that there was insufficient evidence that he obstructed justice. We disagree. Section 3C1.1 provides for a two-level adjustment if the defendant "willfully obstructed or impeded . . . the administration of justice during the investigation, prosecution, or sentencing of the instant offense." U.S.S.G.§ 3C1.1. In United States v. Dunnigan, 507 U.S. 87 (1993), the Supreme Court held that an adjustment under § 3C1.1 is mandatory where the defendant commits perjury at trial. Here, the district court found that Sobral perjured himself at trial on six separate matters.**8**

A defendant commits perjury by giving testimony concerning a material matter with the willful intent to provide false testimony. See United States v. Castner, 50 F.3d 1267, 1279 (4th Cir. 1995). The district court's findings during sentencing support its determination that Sobral perjured himself at trial. The testimony of several witnesses (and other evidence) contradicted Sobral's version of facts upon which he could not have been simply confused or mistaken. For example, Sobral testified that he had already paid about $150,000 in restitution to the victims. In contrast, Alex Laufer, the escrow agent for the restitution payments, testified that Sobral had made restitution payments of only $57,953. Similarly, Sobral testified at trial that his transactions with all of the victims were loans. In contrast, Sobral stipulated before the VSCC that each one of the named victims was an "investor" to whom he sold "investment contracts." (J.A. at 36.) Sobral explains the latter inconsistency by stating that he knew the stipulation was untrue when he signed it. Based upon the foregoing, we conclude that the district court was not clearly erroneous in finding, by a preponderance of the evidence, that Sobral perjured himself at trial. Accordingly, the district court did not err by increasing Sobral's offense level by an additional two points.

_____

**8** The six instances include: (1) his testimony concerning his state court guilty plea to defrauding Mr. Lyon; (2) his testimony concerning his stipulation in the civil case; (3) his testimony concerning whether he intended to defraud the victims; (4) his testimony denying his traveling to Maryland to get Ms. Su to endorse her life insurance proceeds; (5) his testimony concerning his employment at the Derand brokerage; and (6) his testimony concerning the amount of restitution that he had paid to the victims.

10

C.

Sobral argues that there was insufficient evidence that he held a position of trust. Again, we disagree. Section 3B1.3 provides that "[i]f the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense," his offense level should be enhanced by two levels. U.S.S.G. § 3B1.3 (emphasis added). The Official Commentary to that provision states that the phrase "position of public or private trust," refers to positions "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)." U.S.S.G. § 3B1.3, comment. (n.1). The Official Commentary also states that "[p]ersons holding such positions ordinarily are subject to significantly less supervision than [other] employees," and that, for the provision to apply, the position must have significantly aided the offender, such as"by making the detection of the offense . . . more difficult." Id. Whether a person holds a position of trust must be determined from the perspective of the victim. See United States v. Moore, 29 F.3d 175, 180 (4th Cir. 1994).

In light of the Official Commentary, the Tenth Circuit in United States v. Williams, 966 F.2d 555 (10th Cir. 1992), set forth the following factors for determining whether a particular position constituted a position of trust:

> [T]he extent to which the position provides the freedom to commit a difficult-to-detect wrong, and whether an abuse could be simply or readily noticed; defendant's duties as compared to those of other employees; defendant's level of specialized knowledge; defendant's level of authority in the position; and the level of public trust.

Id. at 557; see also United States v. Pascucci, 943 F.2d 1032, 1037 (9th Cir. 1991) (noting that "[t]he primary trait that distinguishes a person in a position of trust is the extent to which the position provides the freedom to commit a difficult-to-detect wrong" (internal quotation marks omitted)). Based upon these factors, we readily conclude that Sobral's position as a broker constituted a position of trust. As the Tenth Circuit found in a similar case:

11

> There is no question that, had the defendant actually been an investment advisor/broker as he represented to his victims, he would have occupied a position of trust . . . . An investment advisor/broker is typically an individual who is entrusted with the discretionary authority to manage the assets of his or her clients through the application of specialized knowledge. Such a person is well positioned to commit a difficult-to-detect wrong. This is especially true where the investment advisor/broker is his own employer, as [the defendant] was in the instant case, and is therefore subject to no internal supervision or authority.

United States v. Queen, 4 F.3d 925, 929 (10th Cir. 1993). As such, the district court did not err by increasing Sobral's offense level pursuant to § 3B1.3.

D.

Finally, Sobral argues that the district court's calculation of the financial loss was erroneous.[9] In particular, Sobral contends that the "loss" to the victims should not include the money he has since repaid. Once again, we disagree. The Official Commentary to § 2F1.1 states that "if [the] intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss." U.S.S.G. § 2F1.1 comment. (n.7). Since Sobral made the repayments only after his fraud had been reported to the authorities, those repayments had nothing to do with the amount of loss that he intended to inflict. Thus, the money Sobral has since repaid was correctly included in the loss calculation.

VI.

For the foregoing reasons, we affirm Sobral's convictions but

_____

[9] The district court calculated the "total intended loss" to the victims as $277,653.78. The district court arrived at this number by adding $237,653.78 (the amount stipulated to by Sobral in the civil settlement) to $40,200 (the additional amount fraudulently obtained from the Lyons).

12

vacate the sentence and remand for resentencing.

<u>AFFIRMED IN PART, VACATED IN PART, AND REMANDED</u>

13